FILED
2013 Sep-30  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **BARRY C. HIGGINBOTHAM,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| **V.** ) | Civil Action Number |
| ) | **CV-12-BE-252-S** |
| ) | |
| **THE CITY OF PLEASANT GROVE,** ) | |
| **et. al,** ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This Section 1983 case, filed by a *pro se* Plaintiff, comes before the court on six motions to dismiss filed by all remaining Defendants: "Motion to Dismiss" filed by the Pleasant Grove Police Department (doc. 24), requesting the dismissal of all claims against it with prejudice; "Motion to Dismiss Official Capacity Claims" filed by Mayor Brasseale, Sergeant Roberts, Officer Bullard, Officer Reed, Officer Grigsby, and Officer Lawson (doc. 25); "Motion to Dismiss" filed by Mayor Brasseale and Director Knight (doc. 26), requesting the dismissal with prejudice of all claims against them in their individual capacities; "Motion to Dismiss" filed by the City of Pleasant Grove (doc. 28); "Motion to Dismiss" filed by Officer Grigsby (doc. 30), requesting the dismissal with prejudice of all claims against him in his individual capacity; and "Motion for Partial Dismissal" filed by Sergeant Roberts, Officer Bullard, Officer Reed, and Officer Lawson (doc. 31), requesting the dismissal with prejudice of all claims against them in their individual capacities, except those asserted in Count Six against Officers Roberts, Bullard,

and Reed.

For the reasons stated in this Memorandum Opinion, the court FINDS as follows: that the Pleasant Grove Police Department's motion to dismiss (doc. 24) is due to be GRANTED; that the motion to dismiss official capacity claims (doc. 25) is due to be GRANTED; that the motion to dismiss individual claims against Officer Grigsby (doc. 30) is due to be GRANTED; that the other motions (docs. 26, 28, & 31) are due to be GRANTED IN PART and DENIED IN PART. The following Defendants are due to be DISMISSED as party Defendants: Pleasant Grove Police Department, Officers Grigsby and Lawson, and Director Knight.

## I. BACKGROUND

On January 24, 2012, the Plaintiff, Barry Higginbotham, filed a 63 page Complaint (doc. 1) against 23 Defendants containing five counts; a "Judicial Notice" (doc. 2), advising the Defendants that he was proceeding *pro se*; a motion to proceed *in forma pauperis* (doc. 3); and "Motion to Quash Arrest and Stay Court" (doc. 4), claiming that his arrest criminally violated his federal civil rights. On April 17, 2012, the Plaintiff filed a "Motion to Quash Probation Order" (doc. 5), alleging, among other things, that the Order's issuance "constitutes the crime of extortion in the first degree" and violated a number of the Plaintiff's constitutional rights. He also filed documents and affidavits in support of those claims (doc. 6). The 23 Defendants included the City of Pleasant Grove and a number of its city officials and police officers as well as judges and a prosecutor.

On August 15, 2012, this court entered an Order (doc. 7) denying the motions to quash, and granting the motion to proceed as a pauper. Further, because the court has an obligation to review *sua sponte* the merits of *in forma pauperis* matters, the court's Order (doc. 7), as

subsequently clarified and modified (doc. 9), dismissed all claims in the Complaint, some with prejudice and some without prejudice.   (Doc. 7).  On  September 14, 2012, the Plaintiff filed an Amended Complaint (doc. 10) and then, on September 24, 2012, a Second Amended Complaint (doc. 13).

The Second Amended Complaint contains eleven counts:  Count One - a claim for unlawful search and seizure in violation of his constitutional rights; Count Two - a claim for excessive use of force based on alleged actions of Defendants Bullard, Reed, and Roberts, in violation of his constitutional rights; Count Three - a claim for inadequate training and supervision against the City of Pleasant Grove, Mayor Brasseale, Director Knight; Count Four - a claim that the City of Pleasant Grove, its Police Department, Mayor Brasseale and Director Knight were deliberately indifferent to the Plaintiff's constitutional right based on the custom and policy of tolerating excessive force and unlawful searches and seizures on the part of Pleasant Grove police officers; Count Five - a claim for the tort of outrage; Count Six - a claim based on the alleged assault of the Plaintiff by Defendants Bullard, Reed, and Roberts; Count Seven - a claim based on the alleged false arrest and false imprisonment of the Plaintiff by Defendant Reed and the City of Pleasant Grove; Count Eight - a claim for the alleged violation of the Plaintiff's due process rights under the Fifth, Sixth, and Fourteenth Amendments; Count Nine - a claim for the alleged malicious abuse of process and malicious prosecution by Defendant Reed, the Pleasant Grove Police Department, and the City of Pleasant Grove; Count 10 - a claim alleging the defamation of the Plaintiff's character by Defendants Roberts and the Pleasant Grove Police Department; and Count Eleven - a claim that the City of Pleasant Grove and the Pleasant Grove Police Department subjected the Plaintiff to double jeopardy.

On October 4, 2013, the court entered an Order finding that the Second Amended Complaint complies with Rule 8 of the Federal Rules of Civil Procedure. (Doc. 14).  On November 27, 2012, the remaining Defendants filed the motions to dismiss currently under consideration.  The court stayed discovery and obligations under Rule 26 pending resolutions of those motions.  (Doc. 34).

## II.  STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint.  The motion to dismiss in the instant case attacks the sufficiency of the Second Amended Complaint filed by a *pro se* plaintiff.  Although the court is required to show leniency to a *pro se* plaintiff's pleadings, his complaint is still "subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."  *Moon v. Newsome,* 863 F.2d 835, 837 (11th Cir. 1989).  *Pro se* complaints must "comply with the procedural rules that govern pleadings." *Beckwith v. Bellsouth Telecomms. Inc.*, 146 Fed. Appx. 368, 371 (11th Cir. 2005).

Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)).  A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47).  It does, however, "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are

based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has recently identified "two working principles" for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pleaded facts. That task  is "context-specific" and, to survive the motion, the allegations

must permit the court based on its "judicial experience and common sense. . . to infer more than the mere possibility of misconduct." *Id.*  If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the claim must be dismissed.  *Id.*

### III.  FACTS

The Second Amended Complaint contains 27 single-spaced pages of facts.  The court will attempt to condense them.

Higginbotham states in his pleading that he has been a member of the National Alliance on Mental Illness (NAMI) for the last fourteen years.  Higginbotham is not a resident of the City of Pleasant Grove.  Several members of the NAMI reside in Pleasant Grove, however, and Higginbotham indicates that the existence of relationships with NAMI residents of Pleasant Grove is one of the reasons he visits Pleasant Grove frequently.

According to the Second Amended Complaint, the genesis of Higginbotham's complicated feud with the Pleasant Grove police department and city officials occurred on March 27, 2010 when he began visiting Bill Howard in Pleasant Grove.  Based upon what police officers later told Higginbotham, the Pleasant Grove police identified Howard as a drug dealer after several people supposedly suffered from drug overdoses at Howard's residence.  The Pleasant Grove Municipal Judge, Mayor Jerry Brasseale, the City Council, and Sergeant Ed Rogers of the Pleasant Grove Police Department allegedly issued orders to city police officers to stop, identify, and search every vehicle and individual visiting the Howard residence.  The police officers repeatedly accused Higginbotham of being a drug dealer himself, although he denies that he takes drugs or is a drug dealer; officers would continually make comments like "You just left Bill Howard's House...That makes you a g—damned heroin dealer or a g—damned junkey" or

6

"You're just as sorry as the trash you run around with...."

Higginbotham's pleading chronicles the alleged harassment that often occurred when he entered the Pleasant Grove City limits to visit Howard or another friend, Chris Gardner.  Because of the number of incidents involving various Pleasant Grove officers, the court will provide more details of the individual incidents of harassment as it discusses claims against each Defendant. Generally, however, the harassment took the form of police following, stopping, searching, often ticketing, and once arresting Higginbotham when he visited Pleasant Grove.  A second arrest occurred at Higginbotham's home but was based on an incident occurring in Pleasant Grove. One officer warned Higginbotham that he would receive a ticket every time officers observed him in the area, and police did indeed issue Higginbotham tickets on multiple occasions. On other occasions, officers allegedly pulled guns from the holsters during stops of Higgibotham, cursed at him and called him names, stole $20 from his van's glove compartment, and one officer threatened to kill Higginbotham if he filed charges.  When Higginbotham's van was impounded in September of 2010 in connection with his arrest in Pleasant Grove, he later picked up his van from the wrecker service and discovered that in the interim period someone had tampered with his van: his radiator drain valve had been opened; both radiator hoses had been loosened; the van's engine was damaged, the heads were cracked; four bolts that held the van's water pump in place had been loosened allowing the engine block to be moved.

Higginbotham began lodging complaints about the police harassment as early as April of 2010, sending letters to Mayor Brasseale on April 1, 2010 and October 4, 2010, notifying him of this treatment and asserting that the city, among others, had violated his constitutional rights. Higginbotham received no response to these letters. On January 3, 2011, and May 6, 2011, he

also sent a letter of complaint directed to the City of Pleasant Grove itself about his treatment by the Pleasant Grove police department, demanding a police investigation and complaining of constitutional violations, including the denial of his right to appeal convictions, but he received no response to these letters, either.

During this period of harassment, Pleasant Grove police officers arrested Higginbotham twice: on September 19, 2010 and on September 27, 2011.  On September 19, 2010, he was arrested and charged with carrying a concealed weapon, and eventually found not guilty; criminal possession of Tagamet and Paxil, and eventually found guilty; and operating a motor vehicle without a tag light, and eventually found guilty.  He remained in jail until September 21, 2010, when he was able to post bond. On other occasions, Higginbotham was also charged and eventually found guilty of two counts of failure to use a turn signal.  For these offenses, on April 19, 2011, Judge Ralph Coleman in Pleasant Grove Municipal Court fined him approximately $1,000, and advised him that the last day to file an appeal to Jefferson County was May 3, 2011. At the hearing before Judge Coleman, Higginbotham demanded that the police officers display their dashcam videos from the incidents to verify Higginbotham's version of the events.  The officers refused to do so and instead allegedly committed perjury in falsely recounting the incidents.  The municipal court judge ruled without the benefit of the dashcam video information. However, Higginbotham claims that this record of his conviction mysteriously disappeared.

In late April of 2011, a tornado caused damage in Pleasant Grove, and in the days after the tornado Higginbotham performed volunteer work with several members of the NAMI group at Chris Gardner's property in Pleasant Grove.  National Guard soldiers established check points around the storm-damaged areas. Although Higginbotham was allowed to enter and leave the

area on many occasions, on April 30, 2011 (or the wee hours of the morning on May 1, 2011), he was stopped by a group of officials, including Sergeant Roberts and others, who identified themselves as U.S. Marshals.  As more fully recounted later in this opinion, Roberts accused Higginbotham of being a heroin dealer, issued him a citation for driving on bald tires, and ordered him to stay out of Pleasant Grove except to pay the ticket.  When Higginbotham explained that he needed to come to the courthouse on Tuesday, May 3 to appeal a previous conviction, Roberts told him he could not come into Pleasant Grove on Tuesday and promised: "I will issue a written order to every checkpoint that you are NOT allowed to enter Pleasant Grove, and I will have it signed by the Mayor."  One of the U.S. Marshals similarly ordered him to stay out of Pleasant Grove or be subject to arrest.

On May 3, 2011, when Higginbotham attempted to enter the City of Pleasant Grove to file an appeal, National Guard Soldiers advised him that he was not allowed to enter the City of Pleasant Grove upon orders from the U.S. Marshal's Officer, the Pleasant Grove Police Department, Sergeant Ed Roberts, and the Mayor's Office.  Even though Higginbotham advised the soldiers that he had legal business at the courthouse, the soldiers forced Higginbotham to turn around and leave the city limits.  Higginbotham claims that the courthouse was open for business on May 3, 2011.

Higginbotham was also arrested on September 27, 2011 for bail jumping, and violating his probation, although he claims that he had not jumped bail and he was not on probation.  The next day, a Pleasant Grove magistrate judge told him that she was addressing the claims for criminal possession of prescription drugs, carrying a concealed weapon, failure to use a turn signal, failure to carry proof of insurance, and operating a motor vehicle with bald tires.

9

Higginbotham advised her that judgment had already been entered on some of those charges, including findings that he was guilty on some charges, and he further advised her that he had been turned away from Pleasant Grove when he attempted to go to the courthouse and appeal that judgment.  However, the magistrate judge had no documentation concerning the previous hearing and the findings nor did she have any record of the complaint letters he had sent to the mayor and the city advising that he had been prevented from appealing the convictions.  Higginbotham alleges that the September arrest warrant was a malicious response to Higginbotham's letter of complaint.

Higginbotham remained in jail through October 12, 2011, when he was released on bond.  On January 24, 2012, the city placed Higginbotham on probation.  His conviction for illegal possession of prescription drugs was not included in the probation order.  The city forwarded four traffic tickets to Judicial Correction Services of Hueytown for collection.  When Higginbotham met with officials at Judicial Correction Services, the officials stated that they had no record of the conviction and the $1,000 fine that Judge Coleman imposed.  Higginbotham alleges that the city "did NOT want the plaintiff charged with bail jumping... NOR did it want the plaintiff charged with operating a vehicle with bald tires. " (Doc. 13, at 26).   The court cannot discern exactly what Higginbotham means by that statement nor can it discern exactly what traffic tickets were referred to collection services.

## IV.  DISCUSSION

These motions were difficult to address for many reasons.  First, they are difficult because they challenge a 34-page pleading that reads like a nightmarish law school exam with potential constitutional violations threaded throughout its single-spaced pages.  Second, the plaintiff who

wrote the pleading is *pro se*, which means not only that the claims are more difficult to discern but also that the court must accord leniency to them despite that difficulty.   *See Hughes v. Lott,* 350 F.3d 1157, 1160 (11th Cir. 2003).   Finally, the Defendants ignore or give short shrift to some claims in their briefs, apparently assuming that those claims are not plausible; thus, the Defendants do not always provide the court with the case law and analysis that would be helpful to address these claims.   The court may not, however, ignore or give short shrift to any claims that meet the standard in *Iqbal* and *Twombly*, and even if the claims do not meet that pleading standard, the court must, at the very least, apply the standard and determine whether the facts alleged meet its requirements.

The court will proceed to discuss the six motions to dismiss filed in this action.

## A.  "Motion to Dismiss Filed by the Pleasant Grove Police Department" (doc. 24)

Defendant Pleasant Grove Police Department requests dismissal because, as it points out in its motion, the police department is not a suable entity.  Rule 17 of the Federal Rules of Civil Procedure provides that the "capacity to sue or be sued [is to] be determined by the law of the state in which the district court is held.. . ."  Fed R. Civ. P. 17(b); *see Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir. 1992).  As this court sits in the Northern District of Alabama, the court turns to Alabama law, that provides that police departments are generally not legal entities to be sued.  *See, e.g., Ex parte Dixon*, 55 So. 3d 1171, 1171-72 & n. 1 (Ala. 2010); *see also Ex Parte Haralson*, 853 So. 2d 928, 931 (Ala. 2003) ("[U]nder Alabama law ... the sheriff's department is not a legal entity subject to suit."); *Dean v. Barber,* 951 F.2d at 1214 (noting that "sheriffs departments and police departments are not usually considered legal entities subject to suit").  Further, the Plaintiff makes no objection to the dismissal of the police department as a

Defendant.  (Doc. 37, at 1 ¶ 1).   Accordingly, the court FINDS that the department's motion is due to be GRANTED and the Pleasant Grove Police Department is due to be DISMISSED WITH PREJUDICE.

## B.  Motion to Dismiss Official Capacity Claims (doc. 25)

In this motion, Mayor Breasseale, Director Knight, Sergeant Roberts, and Officers Bullard, Reed, Grigsby, and Lawson request that this court dismiss all claims against them in their *official capacities*.  As those Defendants point out, the law is well-settled that "official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Hardy v. Town of Hayneville,* 50 F. Supp. 2d 1176, 1184-85 (M.D. Ala. 1999) (quoting *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) (citations omitted)). Thus, because official capacity suits are, in essence, suits against the government entity, and further, because the United States Supreme Court has recognized that local governments are subject to suit for monetary damages and for injunctive and declaratory relief, the Court has also recognized that official capacity suits against suable government entities are redundant and unnecessary.  *Graham*, 473 U.S. at 167 n. 14 (stating "there is no longer a need to bring official-capacity actions against local government officials for ... local government units can be sued directly for damages and injunctive and declaratory relief").

In the instant case, Higginbotham sued the City of Pleasant Grove as one of the list of Defendants, and it is a suable entity regardless of whether the particular claims against it remain viable after the rulings on its motion to dismiss.  Based on the Supreme Court's direction, the

12

court FINDS that the official capacity claims against the City's officials are redundant and unnecessary.  Therefore, the court GRANTS the motion and DISMISSES WITH PREJUDICE the official capacity claims asserted against Mayor Brasseale, Director Knight, Sergeant Roberts and Officers Bullard, Reed, Grigsby, and Lawson.

The court acknowledges Higginbotham's objections to the dismissal of the official capacity claims.  (Doc. 37, at 1 ¶ 2).  However, the cases Higginbotham cites in support of his objections are inapposite and do not support the retention of such official capacity claims.  The court notes that this particular problem would not be helped by giving Higginbotham an opportunity to submit evidence and re-plead, because this issue is one of law.

## C.  Motions to Dismiss Individual Capacity Claims

The Defendants sued individually have filed three separate sets of motions to dismiss: (1) "Motion to Dismiss" filed by Officer Grigsby (doc. 30); (2) "Motion for Partial Dismissal" filed by Sergeant Roberts and Officers Bullard, Reed and Lawson (doc. 31); and (3) "Motion to Dismiss filed by Mayor Brasseale and Director Knight (doc. 26).

While the court will address most of these motions separately, one claim addressed in all of these motions is the state law claim of tort of outrage asserted in Count Five, and, because of the Alabama Supreme Court has set narrow parameters to that cause of action, this court will first address that claim as to all the individual Defendants.

### 1. Issues that Apply to Multiple Motions to Dismiss Individual Capacity Claims

#### a.  Tort of Outrage

A plaintiff successfully asserting the tort of outrage under Alabama law must show that the defendants engaged in conduct that "(1) was intentional or reckless; (2) was extreme and

outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Ex parte Bole,* 103 So. 3d 40, 52 (Ala. 2012) (quoting *Green Tree Acceptance, Inc. v. Standridge,* 565 So. 2d 38, 44 (Ala. 1990)). In the seminal case establishing the tort, *American Road Service Co. v. Inmon*, the Supreme Court explained that the alleged conduct must be "so outrageous in character and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon,* 394 So. 2d 361, 365 (Ala. 1980). The Alabama Supreme Court has characterized this tort as "an extremely limited cause of action" and, over the years, the Court recognized three discrete categories of conduct that would fall within the tort: "'(1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1287); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen,* 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322 (Ala. 1989).'" *Ex parte Bole*, 103 So. 3d at 52 (quoting *Potts v. Hayes,* 771 So. 2d 462, 465 (Ala. 2000)); *see also O'Rear v. B.H.,* 69 So. 3d 106 (Ala. 2011) (affirming a judgment on an outrage claim brought against a family physician who began counseling a teenaged male patient at the mother's request and, through the vehicle of the counseling, gave the boy addictive prescription drugs in exchange for homosexual sex).

　　　　In the instant case, the conduct alleged varies among the Defendants. However, the court FINDS that the allegations of the Second Amended Complaint are insufficient to state a claim for relief under this limited theory of liability. None of the conduct alleged in the instant case – harassment, search and seizure, use of force against Higginbotham – falls within the categories of circumstances that the Supreme Court of Alabama has recognized as constituting the tort of

14

outrage.  And, none of the conduct is otherwise commensurate with the type of egregious conduct that the Court has recognized as supporting a claim for the tort of outrage.

Accordingly, the court FINDS that the motions of the individual Defendants is due to be GRANTED as to the tort of outrage claims; the court WILL DISMISS WITH PREJUDICE those claims.

### b.  Qualified Immunity

Further, all of the individually named Defendants raise the defense of qualified immunity as to the federal claims.  Although the court will address the claims against each Defendant individually, a general discussion of this defense is appropriate as it applies to all.  The doctrine of qualified immunity provides that a government official acting within his discretionary authority is immune from suit unless his conduct "violates clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010) (quoting *GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998) (alteration in original)).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citation and quotation omitted).  To prove his entitlement to qualified immunity, the "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. . . . Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (quoting

*Lee v. Ferraro*, 284 F.3d at 1194)).

To determine whether qualified immunity is then appropriate, the Supreme Court has established a two-part test and has granted the district court discretion about the order in which it addresses each part. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  One part of the test is "whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001) *modified by Pearson v. Callahan*, 555 U.S. at 236).  Another part of the test is whether the constitutional violation was clearly established at the time of the alleged wrongful conduct. *Saucier*, 533 U.S. at 201.  The government official is entitled to qualified immunity unless the plaintiff establishes both parts of the test.

The court notes that it should address the qualified immunity issue at this motion-to-dismiss stage, if possible, rather than waiting to address it for the first time at the summary judgment stage. Because the immunity covers immunity from suit, not simply from liability, and is also meant to shield officials from the burdens of litigation, the Supreme Court has repeatedly stressed that courts should address the qualified immunity issue at the "'earliest possible stage.'" *See Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The court also notes Defendants' argument that – when the court addresses whether the factual matter supporting the allegations  in the Amended Complaint plausibly suggest a right to relief – a heightened pleading standard applies because the case involves § 1983 claims asserted against an individual raising qualified immunity.  However, Defendants are wrong in claiming that a heightened pleading standard applies after the case of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  As the Eleventh Circuit explained in its *Randall v. Scott* decision, "[a]fter *Iqbal* it is

clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints."  610 F.3d 701, 710 (11th Cir. 2010).  Three years after *Iqbal* and two years after *Randall*, the time has come for counsel for the Defendants to remove that outdated argument from their legal arsenal.

Because the doctrine of qualified immunity requires the application of the law to each fact situation, the court will conduct an analysis of this doctrine based on the allegations stated against each individual Defendant.

### 2.  Officer Jonathan Grigsby (doc. 30)

The Plaintiff's Second Amended Complaint lists Officer Jonathan Grigsby as a Defendant in the style not only in his official capacity but also individually.  As discussed previously, the court will dismiss the tort of outrage claim and the official capacity claim against Grigsby.  The court will now address the federal claims against him in his *individual* capacity and his defense of qualified immunity.

In the thirty-four pages of the Second Amended Complaint, Higginbotham mentions Officer Grigsby five times:  in the style; in ¶ 6, which simply lists the parties; and in three paragraphs in the fact section:   ¶ 31, which narrates the alleged events of September 19, 2010, as set out below; in ¶ 35, as set out below; and in ¶ 70, as set out below.  However, *none of the actual Counts refers to Grigsby*.  Some of the Counts specifically name Defendants and some refer only generically to "Defendants" and purport to incorporate by reference all previous paragraphs in the lengthy pleading.  Thus, the court is unsure about which specific claims Higginbotham intended to assert against Grigsby and which specific facts he intended to incorporate by reference; the preceding paragraphs are numerous.  Incorporating all preceding

paragraphs by reference is not the preferred practice, because that practice requires the court to assume and guess about the incorporation process.  But Higginbotham is *pro se*.  "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed."  *Hughes v. Lott,* 350 F.3d at 1160.   Therefore, the court will examine the facts alleged in ¶¶ 31, 35, and 70 to determine whether they state sufficient claims against Grigsby.

Paragraph 31 states that on September 19, 2010, *before* Grigsby arrived at the scene in a separate car, Officer Reed had allegedly already pulled over Higginbotham's van, blinded Higginbotham and passenger Chad Galloway with a spotlight, threatened them, and after Higginbotham called 911 complaining about Reed's treatment, Reed allegedly punched the hood of the van, grabbed Higginbotham by the arm, required him to exit the van at gunpoint, violently shoved Higginbotham into the side of the van, violently twisted his arm behind his back, handcuffed him in a manner that caused considerable pain, and dragged him to the back of the van to point out that his tag light was not working.  At that point, Reed apparently arrested Higginbotham and placed him in the police car[1] while Reed began to search the van.  Grigsby subsequently arrived, and Higginbotham provides the following factual allegations specifically against Grigsby:

> **31.....**Officer Jonathan Grigsby arrived at this time, and asked Officer Reed what was going on.  The plaintiff alleges that Officer Reed made the loud statement, "**He tried to call the Sheriff's Dept. on me...  He's going to pay for that**"!  The

---

[1] Although the pleading does not state outright that Reed placed Higginbotham in the police car, it states that Reed stated, "I am throwing you in jail," then states that Reed "left the Police Car, and began an illegal search of the plaintiff's van," and later states that Reed returned to the police car with a gun he found in the van.  This whole narrative reflects that Higginbotham was secured in the police car at that time of the search.  (Doc. 13, at 12).

plaintiff alleges that Officer Grigsby made no comment, nor took any action, after hearing Officer Reed's statement.  The plaintiff alleges that Officer Reed returned to the Police Car several minutes later, and that he had, in his possession, the plaintiff's papers, and other articles from the plaintiff's glove compartment.  The plaintiff alleges that he watched both Officers search through his papers, and other articles, on the trunk of the Police Car.  The plaintiff alleges that he observed Officer Mark Reed stuff the (**$20)** bill, mentioned in **paragraph 13**, into his left, front, pants pocket.  The plaintiff alleges that he also observed Officer Reed stuff the plaintiff's spare set of keys into this same pocket, as well, The plaintiff alleges that after he observed these criminal actions, Officer Reed blinded him once again, with his spotlight, and laughed hysterically.  The plaintiff alleges that Officer Reed then unrolled, and opened a paper pharmacy bag which contained the prescription drug, Paxil.  The plaintiff states that this Paxil had been prescribed to Debra Bates of Pleasant Grove, and that he had been driving her to her doctor's appointments, and to Payless Drugs in Fairfield in order to get her prescriptions filled.  The plaintiff state that he had placed the Paxil in his glove compartment, the last time he had driven Debra Bates to her doctor's appointment.  The plaintiff alleges that Officer Reed then informed him that he would be charged with the **criminal possession** of prescription drugs.

[The next paragraphs indicate that Officer Reed, not Grigsby, drove Higginbotham to the Pleasant Grove Jail, and do not indicate that Grigsby had further involvement with Higginbotham on that evening.]

(Doc. 13) (emphasis in original).

As to a separate incident, in ¶ 35, the plaintiff alleges as follows:

that Officer Jonathan Grigsby, having a legal duty to prevent the commission of crimes, did willfully, deliberately, and with malice aforethought, allow Officer Mark Reed to **violate** the plaintiff's **Federal Civil Rights.**  The plaintiff alleges that Officer Grigsby's inaction, alleged in **paragraph 31**, constitutes a conspiracy to violate the plaintiff's **Federal Civil Rights,** under **42 U.S.C. Section 1983.**....The plaintiff alleges that Officer Grigsby was acting under "**color of sate law**" when he deprived the plaintiff of his **constitutional rights.**"

(Doc. 13) (emphasis in original).

In ¶ 70, the plaintiff alleges as follows:

[A]t approximately 8:45 p.m. on September 27th of 2011, Officer Jonathan Grigsby, Officer Stacy Lawson, and a third Pleasant Grove Police Officer, arrived at [Higginbotham's] residence with an **arrest warrant.**  The plaintiff alleges that

> this arrest warrant charged him with bail jumping, and violating his probation.  The plaintiff states that he had not jumped bail, because the City of Pleasant Grove was responsible for denying him his right to make an appeal bond to the county, as alleged in **paragraphs 63, 64, 65, 66,** and **69.**  The plaintiff states that he was **NOT** on probation for any reason.  The plaintiff alleges that this arrest constituted an **illegal seizure** of the plaintiff, in violation of the **Fourth Amendment,** and the **Due Process Clause** of the **Fourteenth Amendment;** And a violation of plaintiff **Fifth Amendment Right** against **Double Jeopardy.**  The plaintiff alleges that the City of Pleasant Grove was acting under "**color of state law**" when it deprived him of his **constitutional rights.**

(Doc. 13) (emphasis in original).

Having viewed these paragraphs while keeping in mind the leniency afforded to *pro se* litigants,  the court will assume that the Second Amended Complaint attempts to assert against Officer Grigsby the following claims under § 1983: (1) illegal search and seizure in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States based on (a) the search of Higginbotham's van on September 19, 2010; and (b) Higginbotham's arrest on September 27, 2011;  (2) conspiracy to commit search and seizure in violation of those same Constitutional Amendments based on the September 19, 2010 search; (3) failure to intervene when a duty to intervene allegedly existed.; and (4) due process violations.   The court will address these claims separately.

### a.  Illegal Search and Seizure

Officer Grigsby raises the defense of qualified immunity as to all federal claims against him individually, including those involving illegal search and seizure.  The court FINDS that Officer Grigsby was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred related to search and seizure, and, thus, the burden shifts to Higginbotham to prove that the imposition of immunity is not appropriate.  To determine

whether he has done so, the court will discuss each incident separately.

*(1) September 19, 2010 Search and Seizure*

The first search and seizure incident upon which Higginbotham bases his claims against Officer Grigsby occurred, if at all, on September 19, 2010. Because Officer Grigsby raises an additional affirmative defense as to this incident – a statute of limitations defense – the court will first address that defense. Officer Grigsby contends that any claims related to this incident are barred because Higginbotham did not file suit until more than two years after the incident occurred. He is correct that the two year statute of limitations applies, but is incorrect that Higginbotham's suit is not timely.

Higginbotham filed his first complaint timely, on January 24, 2012. (Doc. 1). The court dismissed the claims in that complaint in August of 2012, but did not make clear at that time whether it was dismissing the claims against Officer Grigsby. On September 14, 2012, the court clarified its August 2012 order, confirming that it had indeed dismissed all claims against Officer Grigsby, some with prejudice and some without, and the court gave Higginbotham a chance to file an Amended Complaint. Later that same day – September 14, 2012 – which was several days *before* the two-year statute ran, Higginbotham filed an Amended Complaint (doc. 10), stating constitutional claims against Officer Grigsby relating to the September 19, 2012 search and seizure incident. Thus, the officer is incorrect when he argues that as of September 19, 2012, the court had dismissed Higginbotham's claims against Grigsby and that Higginbotham had failed to timely re-plead within the statute. Although Higginbotham later filed a Second Amended Complaint on September 24, 2012 – after the statute had run – no dispute exists that Higginbotham had filed his first amended complaint including this claim and the other claims

21

against Grigsby before the statute had run.  Therefore, Officer Grigsby's statute of limitations defense is not well taken.

As to the qualified immunity defense for the incident of September 19, 2010, the court has already determined that Grigsby was performing within the scope of his discretionary authority, and he is, therefore, immune from suit *unless* Higginbotham's alleged facts – if true – would establish that he had violated clearly established law.  Based on the allegations of the Second Amended Complaint, Grigsby arrived *after* Reed had arrested Higginbotham and was in the midst of searching Higginbotham's van.  The only "search and seizure" Grigsby conducted on that occasion was assisting Reed in completing the search Reed had already begun after the arrest. The court FINDS that based on the allegations of the Second Amended Complaint, a reasonable officer in Grigsby's position would not have known that Reed had conducted an illegal arrest or an illegal search and seizure.

In the Second Amended Complaint, Higginbotham places great emphasis on the statement Reed mad to Grigsby:  "He [Higginbotham] tried to call the Sheriff's Dept. on me... He's going to pay for that"! [sic].  Although Higginbotham relies on that statement as an admission of wrongdoing, that statement does not itself specifically advise Grigsby that the arrest was unconstitutional or otherwise improper.  Further, it does not advise Grigsby that the search conducted was without arguable probable cause or otherwise unconstitutional.  For all Grigsby knew, this statement meant that Higginbotham had tried to call the sheriff's department as a delaying tactic and act of belligerence when Reed was performing a by-the-book stop and arrest.

The Complaint provides no other allegations showing that a reasonable officer in Grigsby's shoes would have known that arguable probable cause did not exist for searching

22

Higginbotham's van and that the search was a violation of his constitutional rights pursuant to clearly established law.  In any event, where the facts and circumstances within a law enforcement officer's knowledge caused an objectively reasonable belief that the arrestee had committed an offense, probable cause exists and "is an absolute bar to a [§] 1983 action." *Marx v. Gumbinner,* 905 F.2d 1503, 1505-06 (11th Cir. 1990).  In other words, Grigsby did not need actual probable cause but only "arguable probable cause" to justify the search and seizure. *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir. 1997) (citation omitted).

Higginbotham's pleadings, if taken as true, fail to establish that Grigsby is not entitled to immunity as to the September 2010 incident.  The motion to dismiss is due to be GRANTED as to this claim against Grigsby.

### (2) September 27, 2011

Higginbotham also alleges that his arrest on September 27, 2011 constitutes an unlawful search and seizure.  Once again, because  the court has already determined that Grigsby was acting within the scope of his discretionary authority at the time of the September 27, 2011 arrest, he is, therefore, immune from suit *unless* Higginbotham's alleged facts regarding that arrest would establish that Grigsby had violated clearly established law.  However, the only facts he alleges against Grigsby regarding that arrest is that Grigsby was one of the three police officers that arrested him pursuant to an arrest warrant charging him with bail jumping and violating his probation.  Higginbotham claims that he had not jumped bail and was not on probation, and, thus, claims the arrest was an illegal search and seizure.  However, he does not allege that Grigsby *knew* that arrest warrant presented a false charge, or that Grigsby was responsible for the issuance of an arrest warrant presenting a false charge.  Further, he does not allege facts showing

that no reasonably competent officer in Grigsby's shoes would have known that a warrant should issue.  Therefore, Higginbotham has not pled facts showing that a reasonable officer in Officer Grigsby's shoes would know that he was violating Higginbotham's clearly established constitutional rights, either under the Fourth Amendment or Due Process Clause, when he participated in Higginbotham's September 2011 arrest.  *See Messerschmidt v. Millender,* ___ U.S. ___, 132 S. Ct. 1235, 1245 (2012) (stating that, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination");  *Pearson v. Callahan,* 555 U.S. 223, 244 (2009) (recognizing that, in cases alleging Fourth Amendment violations for a search and seizure pursuant to a warrant,  officers generally have a right to rely on a neutral magistrate's issuance of a warrant to establish their own "objective good faith" in acting on it).

The court FINDS that Grigsby's motion to dismiss is due to be GRANTED as to the claims regarding illegal search and seizure, and those claims are due to be DISMISSED.  Noting that Higginbotham's pleading is his third, the court will dismiss these claims WITH PREJUDICE.

### b.  Conspiracy to Commit Illegal Search and Seizure

In paragraph 35 of his Second Amended Complaint, Higginbotham alleges that Grigsby's inaction while Officer Reed allegedly violated Higginbotham's constitutional rights on September 19, 2010 constitutes a conspiracy to violate those rights.

Conspiring to violate another person's constitutional rights constitutes a § 1983 violation. *Dennis v. Sparks,* 449 U.S. 24, 27 (1980); *Rowe v. City of Fort Lauderdale,* 279 F.3d 1271, 1283 (11th Cir. 2002). To state a claim for relief based on a conspiracy to violate rights protected by § 1983, a plaintiff's complaint must state that the defendant "reached an understanding" to deny

24

the plaintiff his constitutional rights.  *Strength v. Hubert,* 854 F.2d 421, 425 (11th Cir. 1988),

*overruled in part on other grounds by Whiting v. Traylor,* 85 F.3d 581, 584 n. 4 (11th Cir. 1996).

The complaint must consist of more than "purely conclusory allegations" but instead, must state

material facts that, if true, would establish the existence of the understanding.  *Harvey v. Harvey,*

949 F.2d 1127, 1133 (11th Cir. 1992). "The linchpin for conspiracy is agreement, which

presupposes communication." *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.,* 956 F.2d 1112,

1122 (11th Cir. 1994).

 Higginbotham has cited non-controlling law for the proposition that under some

circumstances an officer's inaction while another officer is committing a violation of

constitutional rights in his presence can constitute acquiescence to that violation and can mean

that the first officer has engaged in a conspiracy to commit that violation.  The cases cited do not

necessarily stand for that expansive proposition and are inapposite to the instant one for a number

of reasons.

 As a primary distinguishing point, none of the claims in those cases are framed as a

conspiracy claim.  All of the cases Higginbotham cited – *Jackson v. Patazes,* 810 F.2d 426 (4th

Cir. 1987),  *Hafner v. Brown*, 983 F.2d 570 (4th Cir. 1992), and *Browning v. Snead,* 886 F. Supp.

547, 552 (S.D. W. Va. 1995) –  involved claims of excessive force, a category of cases in which

the court has recognized at times a duty of the officer witnessing the excessive force to intervene.

*See Valazquez v. City of Hialeah,* 484 F.3d 1340, 1341-42 (11th Cir. 2009).   Therefore, the

allegation against the officer was not that he *conspired* with the person using excessive force but

that he either participated in the excessive force or failed to intervene when he had a duty to do

so.

25

In the instant case, Grigsby was not present during Reed's conduct that allegedly constituted excessive force.  Therefore, the court finds that the cases cited are distinguishable from the instant case and that they fail to support the conspiracy claim.

Further, the court finds that the facts pled in the instant case, if true, do not state a plausible claim for conspiracy.  Higginbotham has pled no facts showing that Grigsby had an understanding with Reed to violate Higginbotham's constitutional rights.  In addition, the facts pled do not necessarily show Grigsby had notice that Reed was violating Higginbotham's constitutional rights.  Grigsby's mere presence on the scene for part of the incident, with no additional facts showing that Grigsby knew Reed was violating constitutional rights and had an agreement with Reed to deny Higginbotham those rights, is not enough to successfully plead conspiracy, and Higginbotham's conclusory allegations do not supply facts necessary to survive the motion to dismiss.  Therefore, the court FINDS that the motion to dismiss is due to be GRANTED as to the conspiracy claim against Grigsby.  Because this pleading is Higginbotham's third, the court will DISMISS this claim WITH PREJUDICE.

### c.  Failure to Intervene

Higginbotham's Second Amended Complaint also conceivably can be read as alleging that Officer Grigsby had a duty to intervene when Reed exerted excessive force against Higginbotham.  Eleventh Circuit law is clearly established "'that an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'  Therefore, an officer who is present at such a beating and fails to intervene may be held liable though he administered no blow." *Velazquez,* 484 F.3d at 1341-42 (quoting *Fundiller v. Cooper City,* 777 F.2d 1436, 1441-42 (11th

Cir. 1985)).

As noted above, in the instant case, the allegations of the Second Amended Complaint show that any alleged excessive force occurred *before* Grigsby arrived on the scene.  Therefore, he was not present, and has no § 1983 liability for failing to intervene.  The motion to dismiss as to the failure to intervene claim against Grigsby is due to be GRANTED.  The court will DISMISS that claim and, because this pleading is Higginbotham's third, the dismissal will be WITH PREJUDICE.

### d.  Due Process Violations

The text of Count Eight, generally alleging due process violations under the Fifth, Sixth, and Fourteenth Amendments, does not specifically name Grigsby.  To the extent, if any, that Higginbotham asserts a due process claim against Grigsby, that claim would have to be connected with the incidents on September 19, 2010 and September 27, 2011, both of which involve the search/seizure and arrest of Higginbotham.  As the Supreme Court of the United States has recognized, claims about conduct that occurred "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" are best analyzed under the Fourth Amendment, "not the more generalized notion of 'substantive due process.'" *See Graham v. Connor,* 490 U.S. 386, 395 (1989) (stating quoted language in the context of an excessive force claim).

As no claims remain against Officer Grigsby, the court will DISMISS him as a party Defendant.

### 3.  Sergeant Roberts and Officers Bullard, Reed, & Lawson (doc. 31)

In this motion by multiple Defendants, the Officers request the dismissal of all claims

27

against them individually, except the state law claim for assault in Count Six. The court, therefore, will address the following claims: (1) Count One - § Section 1983 claims against all four alleging unlawful stop, search, and seizure in violation of the Fourth Amendment; (2) Count Two - § 1983 claims against Roberts, Bullard, and Reed for excessive force; (3) Count Seven - § 1983 claim against Reed for false arrest and imprisonment; (4) Count Eight - § 1983 claim against all four for due process violations; (5) Count Nine - state law claim against Reed for malicious abuse of process and prosecution; and (6) Count Ten - § 1983 claim against Roberts for defamation.  As discussed previously, the court has already dismissed the tort of outrage claims asserted against these Defendants.  These Officers raise the defenses of a statute of limitations bar and qualified immunity.

### a. Statutes of Limitation Issues that apply to multiple Defendants

The Defendants argue that claims involving the incidents that occurred more than two years before the filing of the Second Amended Complaint on September 24, 2012 are barred by the applicable two-year statute of limitations.

#### (1) September 19, 2010 Incident

As discussed previously, Higginbotham filed an Amended Complaint (doc. 10) on September 14, 2012, before the two-year statute of limitations ran as to the September 19, 2010 incident.  That Amended Complaint contained allegations against the four officers regarding unlawful search and seizure and excessive force in violation of the Fourth Amendment, and that Amended Complaint was still in force when Higginbotham filed the Second Amended Complaint later that month.  Thus, any arguments regarding a statutory bar as to the September 19, 2010 incident are not well taken.

28

*(2) March 27 & 28, 2010 Incidents*

As to the March 27 & 28, 2010 incidents, the Defendants argue that the two-year statute of limitations bar the claims about them.  Although Higginbotham filed suit in January of 2012, before that statute ran, the Defendants argue that the court's dismissal of those claims in August of 2012, after the statute ran, means that they are time-barred.  The court agrees that the claims dismissed *with* prejudice are time-barred, but the Defendants also argue that the claims the court dismissed *without* prejudice are time-barred even though Higginbotham timely amended by the date the court provided in the dismissal order.  The Defendants assert that the statutory bar converts, in effect, a dismissal without prejudice into one with prejudice and that Higginbotham could file an amended complaint only asserting claims that were not then time-barred.

As Defendants assert, the "constitutional claims brought under ... § 1983 are tort actions, subject to the statute of limitations governing personal injury in the state where the § 1983 action has been brought."  *McNair v. Allen,* 515 F.3d 1168, 1173 (11th Cir. 2008).  In Alabama, the state where this court sits, the statute of limitations governing personal injury is a two-year statute.  Ala. Code § 6-2-38(1) (1975).  Higginbotham initially filed this action in January of 2012, and that complaint was in effect in March of 2012, when the two-year statutory period ran on the claims involving the March 2010 incident.  Further, the Defendants, who had not been served, had not filed a motion to dismiss at the time that the statute ran as to those claims, so Higginbotham had not been placed on notice that his initial complaint was defective.  In August of 2012, the court *sua sponte* dismissed all claims, some with prejudice and some without – or intended to dismiss all claims; the court later clarified or modified its order to specify the rulings also included the dismissal of claims against Officers Reed and Grigsby.

29

As noted above, the Defendants assert that the court's dismissal of the claims regarding the March 2010 search and seizure after the statute had run on them does not authorize the filing of subsequent claims, and further, that the filing of a civil action later dismissed does not toll the statute while that action is pending.  None of the cases Defendants cited involves facts analogous to those presented here, where the court had dismissed claims with or without prejudice in the original suit but had provided a time period *during the original suit* to amend so that the claims alleged to have been time-barred were still brought in the original suit within the time provided by the court to amend the complaint.  The court notes that it never entered an order dismissing the entire action because Higginbotham amended the complaint within the time the court provided.

However, the court FINDS to the extent, if any, the dismissal of the claims without prejudice meant that the amended claims asserted in the same action as to the March 2010 incidents were time-barred, that equitable tolling applies to them and prevents the application of the statutory bar.  The court recognizes that equitable tolling is to be used sparingly.  But, the instant situation falls into a category that the Supreme Court of the United States has recognized as appropriate for the operation of equitable tolling: "where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period."  *See Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 95 (1990).   Similarly, the Eleventh Circuit has explained that equitable tolling is warranted when a plaintiff timely files what is later revealed to be a defective pleading and "in all other respect acts with 'the proper diligence .... which .... statutes of limitation were intended to insure....'" *Justice v. United States,* 6 F.3d 1474, 1479 (11th Cir. 1993) (quoting *Burnett v. New York Central R. Co.,* 380 U.S. 424, 430 (1965)).

In the instant case, Higginbotham timely filed the instant suit prior to the running of the two-year statutory period, and had no notice of the defective state of his pleading as of the running of the statute.  When he was so advised by order of the court after the statute had run, he amended his complaint within the time provided by the court to do so.  He, a *pro se* plaintiff, has acted with due diligence in timely filing the initial complaint and in following the court's direction regarding timely amending that complaint.  To the extent, if any, that the claims dismissed without prejudice and re-asserted in the same suit within the period provided for amending the complaint are barred by the two-year statute, the court, in its discretion, finds that the interests of justice require the application of the doctrine of equitable tolling.  Thus, the court FINDS that the doctrine applies to TOLL the running of the statute of limitations, and that the claims regarding the March of 2010 incidents that this court dismissed without prejudice but which Higginbotham reasserted in the Amended Complaint (doc. 10) and the Second Amended Complaint (doc. 13) are not time barred.  Because those claims are not time barred, the court will proceed to address those claims below, along with the others alleged.

### b.  Claims against Officer **REED**

The Second Amended Complaint presents the following claims against Officer Reed addressed in the motion to dismiss:  (1) Count One - § 1983 claim alleging unlawful stop, search, and seizure in violation of the Fourth Amendment; (2) Count Two - § 1983 claim for excessive force; (3) Count Seven - § 1983 claim for false arrest and imprisonment; (4) Count Eight - § 1983 claim for due process violations; and (5) Count Nine - state law claim for malicious abuse of process and prosecution.  It also presents the tort of outrage claim in Count Five that the court has already found is due to be dismissed.

31

According to the Second Amended Complaint, all of these claims arise out of an incident that occurred late at night on September 19, 2010, after Higginbotham left Bill Howard's home, as previously recounted in the Grigsby section of this opinion.

> ### (1) Count One - § 1983 claim against Reed for unlawful stop, search, and seizure in violation of 4th Amendment

The Amended Complaint alleges that the September 19, 2010 stop, search and seizure incident involving Reed violated Plaintiff's constitutional rights.  The only argument that Reed's brief supporting the motion to dismiss presents as to this claim is to assert that the claim is barred by the statute of limitations, an argument that the court previously rejected.  The brief does present substantive arguments about claims for unlawful search and seizure asserted against other officers, and the court assumes that if Reed intended to present a qualified immunity argument as to this claim at this stage of the litigation, he would have done so.  He did not.  Accordingly, the court has addressed and rejected the only argument Reed presented on this claim.  The court DENIES the motion to dismiss as to this claim, and the court will proceed to address the other arguments presented.

> ### (2) Count Two - § 1983 claim for excessive force against Reed

In Count Two of the Second Amended Complaint, Higginbotham alleges that "Officer Mark Reed... used excessive force by unlawfully swinging a Maglite into the face of the Plaintiff, in a menacing manner, and by unlawfully drawing his handgun, and forcing the Plaintiff to exit his van at gunpoint. The plaintiff was unarmed, and at no point posed any grave threat to Officer Reed, that would cause the need for the use of a firearm."  (Doc. 13, ¶ 92). Previous paragraphs, incorporated by reference, state that this incident of alleged excessive force occurred after 11:00

p.m. on September 19, 2010 during an investigative stop and after a heated verbal exchange between Officer Reed and Higginbotham that culminated in Higginbotham's call to 9-1-1 to complain of harassment.  During that stop, the following occurred: Reed aimed a spotlight into Higginbotham's side mirror and in his face multiple times; Reed aimed a spotlight at his passenger multiple times, and cursed at him when he objected; Reed punched the hood of the van; unlocked, violently opened the driver-side door, and grabbed Higginbotham's left arm; when Higginbotham pulled his arm from Reed's grip, Reed removed his handgun from its holster and pointed it at Higginbotham; when Higginbotham called 9-1-1, Reed grabbed Higginbotham's cell phone, turned it off, and violently shoved him into the side of the van; Reed violently twisted Higginbotham's arms behind his back, and handcuffed his wrists tightly, causing considerable pain; Reed violently dragged Higginbotham to the rear of his van to show him that the tag light was not working; and Reed threatened to kill Higginbotham if he tried to file charges or a lawsuit against him.  Higginbotham does not allege any permanent injuries as a result of the force Reed used and does not allege that he required medical care or was bleeding or received bruises or any physical injuries as a result of the force used.

In Defendants' brief in support of their motion to dismiss, they argue that Higginbotham's excessive force claims against them are subsumed within the unlawful stop and seizure claims that are based on the same incidents.  In Reed's case, the only excessive force claim alleged against him in the Second Amended Complaint stems from the September 19, 2010 stop/search/seizure incident, and thus, Reed argues that it would be subsumed within the § 1983 claim for the unlawful stop/search/seizure regarding that incident.

"Under this Circuit's law ... a claim that any force [used] in an illegal stop or arrest is

33

excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Jackson v. Sauls,* 206 F.3d 1156, 1171 (11th Cir. 2000); *see also Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir. 1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation.").

An excessive force claim, on the other hand "evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest." *Bashir v. Rockdale Cnty., Ga.,* 445 F.3d 1323, 1332 (11th Cir. 2006). Thus, the excessive force claim is subsumed in the illegal stop or arrest claim *if the arrest lacked probable cause and is found to be unconstitutional* but, to the extent the arrest was lawful, then the excessive force claim presents a discrete and separate constitutional violation "relating to the manner in which an arrest was carried out, and is independent of whether law enforcement has the power to arrest." *Id.*

Because the court does not address the merits of the search and seizure claim involving Reed, and thus, does not perform a probable cause analysis regarding the arrest at this stage of the proceedings, the court does not make a determination at this point whether the excessive force claim is subsumed within the illegal stop and arrest claim, and the court must, for these purposes, view them as separate claims.

The Fourth Amendment's "objective reasonableness" standard applies in the determination of whether the force used was reasonableness. *Hadley v. Gutierrez,* 526 F.3d 1325, 1329 (11th Cir. 2008). This standard requires that the court "carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the

34

countervailing governmental interests at stake." *Oliver v. Fiorino,* 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).   To determine whether the force the officer applied was reasonable, the court first focuses on "the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance[s] the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini,* 559 F.3d 1201, 1206 (11th Cir. 2009). The court measures the amount of force used against "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

As a second consideration, the court looks at "'(1) the need for the application of force, (2) the relationship between the need and the amount of force used, [and] (3) the extent of the injury inflicted.'" *Leslie v. Ingram,* 786 F.2d 1533, 1536 (11th Cir. 1986), *abrogated in part by Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir. 2000) (acknowledging that *Graham* invalidated *Leslie*'s fourth factor inquiring into the officer's subjective motive).   The Eleventh Circuit has explained that "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *Nolin*, 207 F.3d at 1257.  The Eleventh Circuit has determined that the following were *de minimis* uses of force: the officer's pushing an arrestee who was handcuffed against a wall because the arrestee spoke after being told to "shut up," *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1556 (11th Cir. 1993); the officer's slamming a suspect against a wall and kicking his feet apart without provocation, *Jones v. City of Dothan,* 121 F.3d 1456, 1460 (11th Cir. 1997) (per curiam); the officer's grabbing an arrestee from behind, shoving and pushing him against a vehicle, which resulted in bruising but no medical

35

treatment, *Nolin,* 207 F.3d at 1258 n. 4.

As a third consideration, the court recognizes "that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. As the Supreme Court explained in *Graham,*

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers ... violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.*  Therefore, the "'[u]se of force must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir. 2002) (quoting *Graham,* 490 U.S. at 396)).

As a final consideration in the reasonableness inquiry, the Eleventh Circuit has recognized that the timing of the use of force is key; an officers' use of force is more likely to be unlawful when it occurs "after the arrest [has] been fully effected, the arrestee completely secured, and all danger vitiated."  *Lee v. Ferraro,* 284 F.3d 1188, 1199-1200 (11th Cir. 2002).

Keeping all of these factors in mind, the court FINDS that the use of force in the instant case is *de minimis*.  The use of force alleged — grabbing Higginbotham's arm, slamming him against the van, twisting his arms behind his back and handcuffing him in a way that caused pain, and dragging him to the rear of the car– is commensurate with the uses of force characterized as *de minimis* by the Eleventh Circuit, and no allegations exist that Higginbotham suffered longterm or permanent pain as a result of the force applied or that he suffered bleeding,

severe bruising or received or required any medical care because of the incident.  Reed used this *de minimis* force in connection with an investigative stop when the driver was less than fully cooperative, engaging in a heated verbal exchange and pulling away when Reed grabbed him. Reed did pull his handgun out of the holster, but Higginbotham's complaint states that Reed did not do so until *after* Higginbotham pulled his arm from Reed's grip.  Accordingly, the excessive force claim asserted against Reed is due to be DISMISSED.

*Alternatively*, if Higginbotham has raised a genuine issue of material fact as to the excessiveness of the force applied, the court finds that Reed has successfully asserted the doctrine of qualified immunity and that the application of that doctrine shields him from suit. Given Reed's invocation of qualified immunity, the court FINDS that Reed was acting within the scope of his discretionary authority when the alleged wrongful acts occurred. He therefore is immune unless  Higginbotham demonstrates that as of September 19, 2010, the law was clearly established that the force Reed used was excessive.

Higginbotham may meet his burden of showing an alleged constitutional violation was well-established in two ways: he must point the court to a materially similar controlling case already decided as of September 19, 2010, determining that the use of force was unlawful; *or* he must show that the conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of case law." *Lee,* 284 F.3d at 1198 (citing *Priester v. City of Riviera Beach, Fla.,* 208 F.3d 919, 926 (11th Cir. 2000)).

Higginbotham has not cited any such materially similar case.  The one case he cites in Count Two of the Second Amended Complaint, *Wakefield v. City of Pembroke Pines,* 269 F.

App'x 936 (11th Cir. 2008) (per curiam) is not a published case, and, thus, does not represent

binding precedent.  *See* Eleventh Circuit Rule 36-2 stating that unpublished opinions are not

considered binding precedent.  In any event, *Wakefield* does not present materially similar facts

to those of the instant case.  *Wakefield* was not a qualified immunity case, and focused upon

whether the City of Pembroke Pines had an official policy and custom of violating constitutional

rights.  Although the fact scenario did include a police officer pointing a gun at a plaintiff during

a traffic stop, along with other instances of alleged misconduct, the Eleventh Circuit did not

specifically rule whether the police officers' use of force was excessive; it merely found that,

even assuming *arguendo* the use of force was excessive, the plaintiff failed to create a genuine

issue of material fact concerning the city's liability for that use of force.  The district court

granted summary judgment in favor of the city and against the plaintiff on the claims and the

Eleventh Circuit affirmed. *Id.*  at 941.  Because the Court of Appeals made no ruling on whether

the use of force was excessive, and because its fact scenario was not sufficiently similar to the

total circumstances  of the instant case, *Wakefield* cannot "clearly establish" that the force Reed

used on Higginbotham violated his constitutional rights.  None of the cases cited in

Higginbotham's response brief regarding qualified immunity is a published excessive force case

from the Eleventh Circuit or the United States Supreme Court.

Another means of overcoming qualified immunity is to prove that the unlawfulness of

the conduct was "readily apparent" to Reed because the conduct "lies so obviously at the very

core of what the Fourth Amendment prohibits. . . ."  *Lee*, 284 F.3d at 1198.  Under this test, the

Eleventh Circuit has explained that the particular facts of this case must be "so far beyond the

hazy border between excessive and acceptable force [that every reasonable officer] had to know

he was violating the Constitution without caselaw on point." *Vinyard,* 311 F.3d at 1355.

An examination of *Graham, Leslie,* and Eleventh Circuit case law up to September 19, 2010 shows that this case is not one "far beyond the hazy border between excessive and acceptable force." As is clear from the recitation of alleged facts at the beginning of this section, when Reed pulled Higginbotham over, the occupants of the car were not compliant and completely cooperative. Rather, they began fussing with the officer about the use of his spotlight even though the use of some light to illuminate the scene and the van occupants was appropriate given the late hour. The verbal exchange became heated with accusations going back and forth culminating in Higginbotham's calling 9-1-1 and insisting to the operator that the officer was harassing him and threatening him. None of the alleged excessive physical conduct occurred until *after* the initiation of the heated verbal exchange and the 9-1-1 call. Further, Reed's pulling out a gun did not occur until *after* Reed had grabbed Higginbotham and *after* Higginbotham had reacted by "pull[ing] his arm from Officer Reed's grip." (Doc. 13, at 12).

Disorderly conduct is a misdemeanor under Alabama law that authorizes an officer to make a custodial arrest. Ala. Code § 13A-11-7. The court does not determine as a matter of law that the conduct of Higginbotham and his passenger was disorderly within the meaning of Alabama law. Rather, the court merely points out that the heated verbal exchange, the 9-1-1 call, and Higginbotham's pulling his arm out of Reed's grasp – when taken together and viewed from the point of view of a reasonable officer in Reed's shoes – at the very least constitutes conduct that an officer could reasonably consider to be disorderly generating a right to make a custodial arrest. Fourth Amendment jurisprudence has long recognized that the right to effect an arrest "necessarily carries with it the right to use some degree of physical coercion or threat

thereof to effect it." *Graham*, 490 U.S. at 396.  Further the Eleventh Circuit "has made clear

that some use of force by a police officer when making a custodial arrest is necessary and

altogether lawful, regardless of the severity of the alleged offense." *Duruthy v. Pastor*, 351 F.3d

1080, 1094 (11th Cir. 2003).  When effecting arrest even for minor offenses, the law authorizes

police officers to use physical restraints and handcuffs and to push suspects. *See, e.g., Nolin*,

207 F.3d at 1257 (finding no constitutional violation where the officer grabbed the suspect,

searched his groin area, and placed him in handcuffs); *Jones v. Dothan*, 121 F.3d 1456, 1460

(11th Cir. 1997) (finding no constitutional violation when the officer slammed the plaintiff

against a wall and kicked his legs apart); *Gold v. City of Miami*, 121 F.3d 1442, 1446-47 (11th

Cir. 1997) (finding no constitutional violation when the officer placed the handcuffs too tightly

onto the plaintiff's hands when arresting him for disorderly conduct).

Finally, the court notes that even the right to make an investigatory stop "necessarily

carries with it the right to use some degree of physical coercion. . . ." *Graham,* 490 U.S. at 396.

When Reed made the investigatory stop, he had the right to use some degree of force to effect it.

The circumstances of that stop escalated to a situation with heated verbal exchanges,

Higginbotham's calling 9-1-1, and, eventually, Higginbotham pulling his arm away when Reed

grabbed it, meaning that at the time of the use of force, Higginbotham was affirmatively

refusing to cooperate; Reed had the right to use some degree of force to control the situation and

do his job.  Further, the use of force occurred in the process of gaining control of and arresting

Higginbotham and not after he had secured control.  And, as noted previously, Higginbotham

does not allege that he received any physical injuries from the force applied other than

temporary pain or that he required any medical care for physical injuries.

In sum, the court FINDS that the force Reed applied was *de minimis* and does not represent a constitutional violation, and, alternatively, to the extent that the force applied did represent a constitutional violation, that every reasonable officer in Officer Reed's position would *not* inevitably conclude that such use of force was unlawful under the standards of *Leslie* and *Graham*.  Accordingly, the court FINDS that Higginbotham has failed to allege facts demonstrating that Reed is not entitled to immunity as to this claim.  The court will GRANT the motion to dismiss as to the claim of excessive force against Reed, DISMISSING that claim.  Further, because this pleading is Higginbotham's third, the dismissal will be WITH PREJUDICE.

### (3) Count Seven - claim against Reed for false arrest and imprisonment

In this Count, Higginbotham claims Reed's actions against Higginbotham on September 19, 2010 constituted false imprisonment and false arrest *in violation of  his constitutional rights*.  Because he specifies constitutional violations and does not mention Alabama law, the court must presume that he intends to bring this claim as a federal claim under § 1983.  The court acknowledges experiencing difficulty distinguishing the claims in this Count from those in Count One.  Perhaps Higginbotham intends for Count One to address Reed's alleged wrongful stopping and searching his vehicle and Count Seven to address Reed's subsequent arrest of Higginbotham on that same evening, which he claims was wrongful. The court will proceed on that assumption.

In Defendants' motion to dismiss, they first argue that this claim is barred by the two-year statute of limitations.  This court dismissed claims against all other Defendants in August of 2012, and then on September 14, 2012 clarified its Order by dismissing claims against Reed

and Grigsby without prejudice to Higginbotham's filing an amended complaint on or before September 24, 2012.  Higginbotham filed the first Amended Complaint on September 14, 2012, containing all relevant facts about the September 19, 2010 incident and naming Reed (Doc. 10, at 9-12), but that pleading contained only six counts and did not contain separate counts for false arrest and false imprisonment.  Higginbotham then filed on September 24, 2012, the Second Amended Complaint with Count Seven, asserting this claim for false arrest and false imprisonment within the time that this court provided for amending.

Because the First Amended Complaint, filed before the statute ran, contained the relevant facts about the September 19, 2010 incident out of which the claim for false arrest and imprisonment arose, the court FINDS that the amendment to that pleading, the Second Amended Complaint, relates back pursuant to Rule 15(c)(1)(B).  Fed. R. Civ. P 15(c)(1)(B) ("An Amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out  – in the original pleading ....").  Alternatively, for the reasons previously discussed, this court FINDS that the doctrine of equitable tolling applies and TOLLS the statute as to this claim.  This claim is not barred.

Other than asserting the rejected statute of limitations argument, Defendants present only a conclusory three-sentence statement, devoid of case law, that Higginbotham has no claim for false arrest because "he was convicted of *most* of the charges which gave rise to Officer Reed's arrest of him" and because "if probable cause existed...to convict Higginbotham, then probable cause certainly existed for Officer Reed's arrest of Higginbotham."  (Doc. 32, at 14) (emphasis added).  While the court appreciates the concise presentation of arguments, counsel should

never be so concise that they fail to present and address the relevant law.  Put another way, they should never confuse a positive brevity for a pejorative bare bones; the bones should never be so bare that the court is left to gnaw without the law.

The Eleventh Circuit has repeatedly stated that individuals enjoy a Fourth Amendment right to be free from unreasonable searches and seizures, including unreasonable arrests, which are seizures of the person.  *E.g., Skop v. City of Atlanta,* 485 F.3d 1130, 1137 (11th Cir. 2007). "The 'reasonableness' of an arrest is, in turn, determined by the presence or absence of probable cause for the arrest." *Id.*  If probable cause existed for the arrest and conviction, then a plaintiff has no claim from false arrest under § 1983.  *See id.*

The court thus looks to the Second Amended Complaint to see if, based on the facts alleged, probable cause existed.  In ¶ 55 of his Second Amended Complaint, Higginbotham acknowledges that Judge Coleman found him guilty of at least some of the charges upon which Reed arrested him on September 19, 2010: criminal possession of Paxil, and operating a motor vehicle without a tag light.  He does not plead that he has challenged those allegedly wrongful convictions on direct appeal or that they were "expunged by executive order, declared to be invalid by a state tribunal authorized to make determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction [ ] that has *not* been so invalidated is not cognizable under § 1983." *Heck v. Humphrey,* 512 U.S. 477, 486 (1994).  *Heck* bars those claims that "if successful, would necessarily imply the invalidity of the conviction because they would negate an element of the offense." *Hughes v. Lott,* 350 F.3d 1157, 1160 n. 2 (11th Cir. 2003).

Obviously, if probable cause existed for conviction, probable cause existed for the arrest,

and, given that Higginbotham acknowledges his conviction for certain offenses, he is barred from challenging the arrest in this lawsuit *as to those offenses*. Accordingly, the claims for false arrest and false imprisonment against Reed are due to be dismissed as to the claims *under which he was found guilty* regarding the September 19, 2010 incident.

Higginbotham was found not guilty, however, of all the offenses for which he was arrested on September 19, 2010: Reed also charged him with carrying a concealed weapon and Higginbotham was not found guilty of that charge.   Defendants rather blithely assert that because Higginbotham was convicted on *most* charges issued on September 19, 2010, a false arrest charge is improper, but they provide no support for that assertion.   Viewing the facts in the light most favorable to the *pro se* Plaintiff, Higginbotham has alleged that immediately after Reed got angry and threatened Higginbotham for calling the 9-1-1 operator, Reed charged him with carrying a concealed weapon based on a *toy* gun, and also expressly stated to another officer that Higginbotham would "pay" for making that 9-1-1 call.   Further, the allegations state, in ¶ 55 that the concealed weapon charge was ultimately resolved in Higginbotham's favor. Those allegations also allege in ¶ 16 that another set of officers had previously been able to "[confirm] that the [same] handgun was a plastic toy."   The court assumes that a trained officer such as Reed similarly would have been able to confirm whether Higginbotham's handgun was a toy.   Higginbotham's allegations provide an inference that Reed charged Higginbotham with the concealed weapon offense without probable cause and in bad faith and with malice, knowing or suspecting that the gun was a toy. *See Seaboard Oil Co. v. Cunningham,* 51 F.2d 321, 322 (5

th Cir. 1931)[2] (stating that while malice and want of probable cause are both essential elements of false arrest and malicious prosecution, "malice may be inferred from want of probable cause").

The court FINDS the allegations state a plausible claim that no probable cause existed for Higginbotham's arrest on that charge, and that his arrest was a deprivation of Higginbotham's constitutional rights to be free from unreasonable arrest.  Further, the court FINDS that, based on the facts alleged and the reasonable inferences derived from those facts, every reasonable officer in Reed's shoes would know that charging Higginbotham with carrying a concealed weapon based on a toy gun, knowing or suspecting it was a toy gun, would be without probable cause and in violation of his constitutional rights.  Accordingly, the court DENIES the motion to dismiss *as to the claim against Reed for false arrest on the concealed weapon charge.*

In sum, as to the claims against Reed in Count Seven, the court GRANTS the motion to dismiss as to all of those claims *except* the arrest on the concealed weapons charge; the court DENIES the motion as to the arrest on that charge.

### (4) Count Eight - Violation of Due Process Rights brought pursuant to § 1983 against Reed

In ¶ 34, Higginbotham claims that Reed's intentional taking of his $20 and spare set of keys, spending the $20 for drinks and snacks purchased on the way to the jail,  denying that he took the money, and failing to return the keys or pay back the money represents taking

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Higginbotham's property without due process of law.  The Fourteenth Amendment provides that "[n]o State shall... deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1.  Here, the allegation is that Reed intentionally took the property and provided Higginbotham with no process or means of objecting to the theft and rectifying the situation.

In the Eleventh Circuit, "a § 1983 claim alleging the denial of procedural due process requires proof of three elements: (1) a deprivation of constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process."  *Cook v. Randolph County, Ga.*, 573 F.3d 1143, 1148-49 (11th Cir. 2009) (quoting *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003)).  But "a procedural deprivation may be cured by providing a later procedural remedy."  *Sullivan Props., Inc. v. City of Winter Springs*, 899 F. Supp. 587, 594-95 (M.D. Fla. 1995) (quoting *McKinney*, 20 F.3d at 1557).

According to the Eleventh Circuit,

> only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise.  It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim.

*Cotton v. Jackson*, 216 F.3d 1328, 1330-31 (11th Cir. 2000) (footnote and quotation omitted). "This rule ... recognizes that the state must have the opportunity to remedy the procedural failings of its subdivisions and agencies in the appropriate fora – agencies, review boards, and state courts – before being subjected to a claim alleging a procedural due process violation."  *Id.* at 1331 (quotation omitted).

46

Thus, the Eleventh Circuit has acknowledged time and time again that the procedural due process "a state provides is not only that employed by the board, agency, other governmental entity whose action is in question, but also includes the remedial process state courts would provide if asked." *Horton v. Bd. of County Comm'rs*, 202 F.3d 1297, 1300 (11th Cir. 2000); *see also Bass v. Perrin,* 170 F.3d 1312, 1319 (11th Cir. 1999); *Harris v. Bd. of Educ.*, 105 F.3d 591, 596 (11th Cir. 1997); *McKinney,* 20 F.3d at 1561-65.  If the state provided adequate remedies and "the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Cotton*, 216 F.3d at 1331.

 The court FINDS that this allegation states a plausible claim that Reed violated Higginbotham's right to due process in taking his property.  Perhaps an adequate remedy for this "taking" existed; however, in the briefing, the Defendant has not provided the court with any information concerning the process available to remedy the wrong.  Further, the court FINDS that the right to be free from a police officer's taking your property without adequate process was clearly established as of the date of the alleged theft, and thus, Reed is not entitled to qualified immunity at this stage of the action.  *See, e.g., Fuentes v. Shevin,* 407 U.S. 67, 82 (1972) (stating that the procedural due process guarantee protects against "arbitrary taking[s]").

> *5) Count Nine- claim against Reed for Malicious Prosecution and Malicious Abuse of Process*

In this Count, Higginbotham claims that Reed's arrest of him on September 19, 2010 constitutes the torts of malicious prosecution and malicious abuse of process.  The Second Amended Complaint does not specify whether Higginbotham brings these claims under Alabama state law or as a claim pursuant to § 1983, but because he does not point to any Alabama law, the

court will address this claim as one brought under federal law.   To establish a § 1983 malicious

prosecution claim, a plaintiff must show two prongs: first, the elements of the common law tort

of malicious prosecution;  and, second, a violation of his right under the Fourth Amendment to

be free from unreasonable seizures under the Fourth Amendment.  *Kingsland v. City of Miami,*

382 F.3d 1220, 1234 (11th Cir. 2004).  The elements of the common law tort of malicious

prosecution are: "(1) a criminal prosecution instituted or continued by the present defendant; (2)

with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and

(4) caused damage to the plaintiff accused."  *Wood v. Kesler,* 323 F.3d 872, 882 (11th Cir. 2003).

In the instant case, the face of the Second Amended Complaint shows that several of the

charges against him were *not* terminated in Higginbotham's favor; Judge Cole found him guilty

of having criminal possession of prescription drugs, operating a motor vehicle without a tag light

and two counts of failing to use a turn signal.  Accordingly, Higginbotham has not stated a

plausible claim as to the malicious prosecution claims regarding those charges; the motion to

dismiss those claims is due to be GRANTED, and the claims against Reed as to those charges are

due to be DISMISSED.

The remaining charge is the charge for carrying a concealed weapon, for which

Higginbotham received a finding of not guilty.  However, as noted, Higginbotham must allege

more than a "not guilty" finding to state a plausible claim: he must also allege facts that would

create an inference that Reed's charge was executed with malice and without probable cause.

As discussed previously under Count Seven, Higginbotham has done so.  *See* discussion *supra*

at 44-45; *see also Brown v. Benefield,* 757 F. Supp. 2d 1165, 1181-82 (M.D. Ala. 2010) (finding

that, for the purposes of a malicious prosecution action, malice may be inferred for want of

probable cause).  The court FINDS that Higginbotham has alleged a plausible claim against Reed for malicious prosecution as to the charge of carrying a concealed weapon. The court further FINDS that every reasonable officer in Reed's position, as alleged in the Second Amended Complaint, would have known that prosecuting him for this charge under these circumstances constituted a violation of Higginbotham's constitutional rights; the law was clearly established that individuals have a right to be free from a prosecution commenced with malice and without probable cause. *See Uboh v. Reno,* 141 F.3d 1000, 1002-04 (11th Cir. 1998).  Therefore, Officer Reed is not entitled to qualified immunity.  The motion to dismiss as to the claim against Reed for malicious prosecution is due to be GRANTED IN PART and DENIED IN PART: granted as to all claims regarding charges except the concealed weapons charge and denied as to the malicious prosecution for the concealed weapons charge.

As to the claim for malicious abuse of process also in Count Nine, this court knows of no decision in which the United States Supreme Court or the Eleventh Circuit has recognized that the tort of malicious abuse of process rises to a constitutional tort cognizable under § 1983.   In any case, the court notes that the tort is generally distinguished from that of malicious prosecution by focusing on the timing of the abuse;  "[M]alicious prosecution concerns the wrongful *issuance* of process; abuse of process concerns the wrongful *use* of process *after it has been issued.*"   *C.C. & J., Inc. v. Hagood,* 711 So. 2d 947, 950 (Ala. 1998).  Put another way, a defendant cannot be liable for an abuse of process unless he somehow "acted outside the boundaries of legitimate procedure *after* the charge had been filed."  *Id.* at 951-52 (emphasis added).

The facts alleged in the Second Amended Complaint against Reed focus on the alleged

wrongful acts of searching, seizing Higginbotham, arresting, him, and filing charges—not on any wrongful use of process *after* the charge had been filed.  Accordingly, the Second Amended Complaint fails to state a plausible claim against Reed for abuse of process under state or federal law.  The motion to dismiss as to that claim against Reed is due to be GRANTED as to the malicious abuse of process claim. Because Higginbotham has already had two opportunities to amend the complaint, the court will DISMISS that claim WITH PREJUDICE.

In sum, the court FINDS that the motion to dismiss is due to be GRANTED as to the following claims *against Reed*: Counts Two, Five, Seven - for all claims *except* the one involving arrest for the concealed weapons charge, and Nine - for all claims *except* the malicious prosecution for the concealed weapons charge. The claims against him in Counts One, Six, Seven - as to the arrest for the concealed weapons charge, Eight, and Nine - as to malicious prosecution for the concealed weapons charge will proceed at this stage.

### c.  Claims against Sergeant **ROBERTS**

The Second Amended Complaint presents the following claims against Sergeant Roberts that are addressed in the motion to dismiss:  (1) Count One - § 1983 claim alleging unlawful stop, search, and seizure in violation of the Fourth Amendment; (2) Count Two - § 1983 claim for excessive force;  (3) Count Eight - § 1983 claim  for due process violations; and (4) Count Ten - Defamation of Character.  As noted previously, the court has determined that the tort of outrage claim against Roberts in Count Five is due to be DISMISSED and the motion does not address Count Six's claim for assault. The court will address the remaining claims against Roberts  separately.

*(1) § 1983 claim against Roberts for unlawful stop, search, and seizure in violation of 4th Amendment.*

Higginbotham claims that the conduct of Roberts and others in conducting unlawful investigatory stops and searches and seizures violated his Fourth Amendment rights guaranteeing "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST.. amend. IV.  "The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment:  (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.'" *United States v. Brown,* 401 F.3d 588, 592 (4th Cir. 2005) (quoting *United States v. Weaver,* 282 F.3d 302, 309 (4th Cir. 2002)).  The court will address each incident separately.

### A.  March 27, 2010

The Amended Complaint alleges that the March 27, 2010 stop, search and seizure incident involving Roberts violated Higginbotham's constitutional rights.  Roberts first asserts that the claim is barred by the statute of limitations, an argument that the court previously rejected.  The brief does present substantive arguments about claims for unlawful search and seizure asserted against Roberts for subsequent stops, and the court assumes that if Roberts intended to present an argument as to the plausibility of this claim or raise qualified immunity as to this claim at this stage of the litigation, he would have done so.  He did not.  Accordingly, the court has addressed and rejected the only argument Roberts presented on this claim.  The court

DENIES the motion to dismiss as to this claim regarding the March 27, 2010 stop, and the court

will proceed to address the arguments presented as to other incidents.

B.  April 29, 2011

The Second Amended Complaint contains the following allegations about an incident on

April 29, 2011, after a tornado damaged Chris Gardner's property:

> The plaintiff states that he, Shane Myers, Chrissy Jackson, and Walter
> "Butch" Morgan assisted Chris Gardner with cleaning, and clearing his
> property.  The plaintiff alleges that Shane Myers, and "Butch" Morgan set fire
> to a pile of debris at approximately 11:45 p.m., and that said fire brought a
> U.S. Marshal, several Pleasant Grove Police Officers, and the Pleasant Grove
> Fire Dept.  The plaintiff states that he did not speak, interact, or initiate
> contact with any of these individuals.  The plaintiff states that the Fire Dept.
> extinguished this fire in less than five (5) minutes.  The plaintiff states that
> Shane Myers freely admitted to everyone present, that he had started the fire.
> The plaintiff alleges that after the U.S. Marshal, the Fire Dept., and all other
> Police Officers had left the property, Sgt. Ed Roberts threatened to arrest
> Shane Myers, "Butch" Morgan, and Chris Gardner if they caused him any
> more problems.  The plaintiff states that he was standing in the middle of 7th
> Street, approximately fifty (50) feet from the location of the fire.  The plaintiff
> alleges that Sgt. Roberts approached him in a menacing manner, shoved him
> backwards against Chrissy Jackson's Dodge Durango, and made the following
> statements, "**That goes for you, too, Barry.   I don't give a damn how
> much law you know, nor how much law you think you know.  I will
> throw you in jail right now, I will lose the paperwork, I will make sure
> that no one lets you use the telephone, I will keep you in jail for the next
> six (6) months, and no one will know where you are... And there won't be
> a god-damned thing you can do about it... You're just as sorry as the
> trash you run around with ...  You're no better than the company you
> keep".**  The plaintiff alleges that Sgt.  Roberts removed his handgun from its
> holster, and then returned it to its holster.  The plaintiff states that he left Chris
> Gardner's property at approximately 1:00 a.m. .... [The pleading also indicates
> that Higginbotham was subsequently stopped momentarily by other State
> Troopers and National Guardsmen on his way home, indicating that this area
> was heavily patrolled during this period.].

(Doc. 13, at 20-21).

The court FINDS that Roberts was acting within the scope of his discretionary authority

when he encountered Higginbotham at Chris Gardner's property, as Roberts was dealing with the fire and its aftermath.  The burden thus shifts to Higginbotham to allege facts that, if proven, show that Roberts's encounter with him or seizure of him violated his clearly established constitutional rights.  Higginbotham alleges that Roberts's conduct during this incident represents an illegal momentary seizure of his person and excessive force attendant to that seizure.  Higginbotham was not in a car at the time. He does not allege that Roberts arrested him or handcuffed him or prevented him from leaving the premises; his allegations of "seizure" appear to be based on verbal threats, one shove with no resulting physical injury, and the sergeant's removal of his handgun from its holster and then replacement of it without pointing it at Higginbotham.   Further, Higginbotham does not allege that Roberts searched him or seized his property.  Accordingly, the court characterizes this incident as a brief encounter between police and citizens, which requires no objective justification.  Even assuming *arguendo* that this incident did constitute a momentary seizure, however, the court finds that no constitutional violation occurred.

Higginbotham cites no case law decided as of April of 2011 establishing that such conduct constitutes a violation of constitutional rights. Other ways he can meet his burden is by "(2) pointing to a 'broader, clearly established principle' that controls 'the novel facts of the situation;' (3) or 'demonstrating that the conduct involved in the case' so obviously violates 'the constitution that prior case law is unnecessary.'" *See Terrell v. Smith,* 668 F.3d 1244, 1255-56 (11th Cir. 2012).  Higginbotham has pointed the court to no broader, clearly established principle controlling this situation nor has he demonstrated by the alleged facts that every reasonable officer in Roberts's shoes would have known that his conduct otherwise obviously violated

Higginbotham's constitutional rights. *See Marx,* 905 F.2d at 1505-06; *Montoute,* 114 F.3d at 184. The court FINDS that Higginbotham has not asserted a plausible claim that Roberts's conduct on April 29, 2011 violated his Fourth Amendment right.  Alternatively, to the extent that he has, the court FINDS that Roberts is entitled to qualified immunity as to that claim.

Higginbotham also claims that the push constituted excessive force in connection with an unconstitutional seizure; however, the court need not spill much ink in its analysis. To the extent, if any, that claim is not subsumed within the claim of unconstitutional search and seizure, Higginbotham alleges no resulting damage other than momentary discomfort and no resulting medical care.  The court FINDS that the force alleged was *de minimus* and does not support a claim for excessive force in violation of the Fourth Amendment.  *See Nolin*, 207 F.3d at 1257 and discussion *supra.*   As to this claim against Roberts regarding the April 29, 2011 encounter, the motion is due to be GRANTED and that claim is due to be DISMISSED.  Because this pleading is Higginbotham's third attempt, the dismissal will be WITH PREJUDICE.

### C. April 30, 2011 & May 3, 2011

The Second Amended Complaint contains the following allegations about an incident occurring on April 30, 2011 [actually shortly after midnight on May 1, 2011] and a follow-up incident on May 3, 2011.  Both occurred shortly after a tornado had hit and badly damaged areas of Pleasant Grove resulting in U.S. Marshal presence to assure safety of citizens and to prevent looting.

> The plaintiff states that he left Chris Gardner's home at approximately 12:10 a.m. The plaintiff states that when he stopped at the intersection of 9th Avenue, and 4th Street he was approached by three (3) men who claimed they were U.S. Marshals.  The plaintiff alleges that one man opened his driver side door, and told him to get

54

out.  The plaintiff alleges that he asked this man what his problem was, and the man replied, "**These police officers have told us that you are a looter, and a heroin dealer**".  The plaintiff states that he was so outraged at this statement, that he exited the car in order to determine which police officers were responsible for this **slander.** The plaintiff alleges that when he asked the man in question who had told him these lies, the man pointed to Sgt. Ed. Roberts.  The plaintiff alleges that another man approached him, claimed to be a U.S. Marshal, shoved the plaintiff backwards against the car, and made the [accusation against Higginbotham of being strung out on drugs and concealing heroin in this vehicle.] The plaintiff states that he told this man... that he was free to search Chris Gardner's car for heroin, if he so desired.  The plaintiff alleges that all three (3) men who had claimed to be U.S. Marshals, began to search the car.. . .The plaintiff states that all of these men were extremely upset when they could not find any heroin in the car.  The plaintiff alleges that the man who had opened his driver side door, approached him for a third time, and made the statement, "**These police officers claim that you are concealing heroin in your work boots, since we cannot find it in the car'.**  The plaintiff states that he removed his left, work boot, and allowed this man to examine it.  The plaintiff alleges that the man who had shoved him against the car, noticed talcum powder in his work boot, shoved him backwards against the car again, and made the accusation [that he was concealing heroin in his work boots.] The plaintiff alleges that Sgt. Ed Roberts then approached him, shoved him backwards against the car, and made that accusations, "**We know that you, and Chris are dealing heroin... And I will stop you, one way or another**".  The plaintiff alleges that Sgt. Roberts then ordered a Pleasant Grove Police Officer to write the plaintiff a traffic citation.  The plaintiff states that when said Officer informed Sgt. Roberts that the plaintiff had not committed any traffic violations, Sgt. Roberts became belligerent, and shouted, "**Just write him a damned ticket for anything, and I will sign it" ... He's been warned that coming into Pleasant Grove would cost him a fortune, and I'm going to make sure that it does**"!  The plaintiff states that said Officer asked the plaintiff for his driver's license, and wrote him a citation for operating a motor vehicle with bald times, and that Sgt. Roberts signed it.  The plaintiff states that Chris Gardner's car did **NOT** have bald tires at this time.  Therefore, the plaintiff alleges that Sgt. Roberts **falsified** this citation. . . . The plaintiff alleges that Sgt. Roberts then made the statement, "**You admit that you went to Bill Howard's house! That proves you are a god-damned heroin dealer**"!  The plaintiff

alleges that when he attempted to leave, Sgt. Roberts shoved him backwards against the car for a third time, and made the threats, **"you have been told several times to stay out of Pleasant Grove ... I am telling you now that I will only allow you to enter Pleasant Grove one more time, and that will be to pay this ticket... I will NOT allow you to have this ticket voided".** [The plaintiff then accused Roberts of violating his civil rights and promised to make an appeal bond to the county on Tuesday.] Sgt. Roberts then made the threats, **"You will NOT come into Pleasant Grove on Tuesday ... I will see to that ... I stopped you from driving your van, and I will stop you from driving this car ... I will issue a written order to every check point that you are NOT allowed to enter Pleasant Grove, and I will have it signed by the Mayor!"** The plaintiff alleges that the man who had opened his driver side door approached him, and Sgt. Roberts at this time, and made the following threats, **"These police officers claim that you are a heroin dealer, and we have no reason to doubt them... They do not want you in their city ... I am a U.S. Marshal, and I am ordering you to stay out of Pleasant Grove.... If you ever enter Pleasant Grove again, you will be arrested, and jailed".** The plaintiff alleges that Sgt. Roberts then made the threat, **"Did you hear that, Barry?  That's an order from the Marshal's office... You had better stay out of Pleasant Grove, or you will be arrested twice...Once by me, and then a second arrest by the Marshal's Office"!** The plaintiff alleges that Sgt. Roberts removed his handgun from its holster, and then returned it to its holster.
***
The plaintiff states that on May 03rd of 2011, he entered the City of Pleasant Grove, in order to make his appeal bond to Jefferson County. . . . The plaintiff alleges that when he stopped at the intersection of 4th Street and 9th Avenue, he was informed by the National Guard Soldiers that he was **NOT** allowed to proceed any farther into Pleasant Grove.  The plaintiff states that he informed these Soldiers that he had legal business at the Pleasant Grove Courthouse, which required his personal attention.  The plaintiff alleges that the Soldiers informed him that they had been instructed by the U.S. Marshal's Office, the Pleasant Grove Police Dept., Sgt. Ed Roberts, and the Mayor's Office that he was **NOT** allowed to enter Pleasant Grove for any reason.  The plaintiff alleges that he was forced to turn around, and leave the City Limits of Pleasant Grove.

(Doc. 13, at 22-23).  Higginbotham alleges that these incidents represent, among other things, an

illegal seizure in violation of the Fourth Amendment, with attendant excessive force.

The court FINDS that Roberts was acting within the scope of his discretionary authority when he encountered Higginbotham on April 30, 2011 as he was patrolling the streets of Pleasant Grove with U.S. Marshals after midnight in the aftermath of a tornado. The burden thus shifts to Higginbotham to allege facts that, if proven, show that Roberts's conduct violated his clearly established constitutional rights.

The court notes that Higginbotham does not claim that *Roberts* stopped him on April 30, but, instead, claims that U.S. Marshals stopped him as he was driving in the storm-damaged area of Pleasant Grove after midnight. Without a stop by Roberts, the court is not sure what Plaintiff alleges was the "seizure" of him by Roberts. The alleged facts do indicate that the Marshals had spoken to Roberts before the Marshals stopped Higginbotham and indicates that the conversation with Roberts resulted in his stop. In any event, the facts reflect that exigent circumstances existed for the April 30 stop because of the tornado damage and the late hour, providing arguable reasonably articulated suspicion for the stop. According, the court FINDS that Roberts's involvement in the stopping of Higginbotham's car on April 30 does not violate the Fourth Amendment by law clearly established as of April of 2011, and he is entitled to qualified immunity as to that claim.

Higginbotham acknowledges that the subsequent search of Gardner's car on April 30 was a search performed with Higginbotham's express permission. Higginbotham also specifically states that he himself removed his work boot and "allowed" one of the Marshals to examine it. Therefore, because he gave consent, those searches cannot represent a constitutional violation.

Other aspects of the April 30 incident are more troubling from a due process standpoint,

but do not involve search and seizure, and, thus, the court will address and analyze that conduct as potential due process violations later in the opinion.

As to the Fourth Amendment illegal search and seizure claim against Roberts regarding the April 30, 2011 incident, the court FINDS that Higginbotham has not alleged a plausible claim.  Alternatively, to the extent, if any, that he has alleged a plausible claim, the court FINDS that Roberts is entitled to qualified immunity.  Accordingly, the motion to dismiss is due to be GRANTED as to this claim against Roberts, and it will be DISMISSED.  Because this pleading represents Higginbotham's third attempt, the dismissal will be WITH PREJUDICE.

In sum, the only Fourth Amendment claim against Roberts that will proceed is the one involving the March 27, 2010 incident.

### (2) Count Two - Excessive Force against Roberts

In paragraph 93 of the Second Amended Complaint, Higginbotham alleges that Officer Roberts used excessive force in unlawfully drawing his handgun on April 29 and April 30, 2011 in the presence of Higginbotham. Higginbotham does not allege that Roberts pointed the gun at him, but alleges that on both occasions Roberts took it out of the holster and replaced it in Higginbotham's presence.  Further, he alleges that Roberts shoved him backwards against a car on both occasions.   To the extent, if any, that the claim is not subsumed within the claim of unconstitutional search and seizure, Higginbotham has alleged no resulting damage other than momentary discomfort and no resulting medical care.

The court FINDS that the force alleged was *de minimis* and does not support a claim for excessive force in violation of the Fourth Amendment.  *See Nolin*, 207 F.3d at 1257, and discussion *supra.*   Thus, the motion to dismiss is due to be GRANTED as to this claim for

excessive force against Roberts; the court will DISMISS it WITH PREJUDICE because this pleading is Higginbotham's third attempt.

### (3) Count Eight - Due Process Violations

Higginbotham's Count Eight does not break down the due process allegations by individual Defendant or specifically name the Defendants against whom this claim applies. However, he refers in this count to "malicious harassment," "guilt by association," the denial of his right to file an appeal bond and appeal traffic citations, and finally, the prevention of his ability to own and operate a motor vehicle and "to visit individual with whom he maintains personal relationships." Because those allegations, set out elsewhere in the Second Amended Complaint, involve Roberts, the court will address them here.

The Fourteenth Amendment's Due Process Clause requires "that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).  To bring a procedural due process claim under § 1983, a plaintiff must prove the following elements: "'(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process.'" *Catron v. City of St. Petersburg,* 658 F.3d 1260, 1266 (11th Cir. 2011) (quoting *Grayden v. Rhodes,* 345 F.3d 1225, 1232 (11th Cir. 2003)).  Citizens "have a constitutionally protected liberty interest to be ... on ... city lands of their choosing that are open to the public generally." *Id.*; *see also City of Chicago v. Morales,* 527 U.S. 41, 54 (1999) (recognizing that  "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment" and stating "an individual's decision to

59

remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,' or the right to move 'to whatsoever place one's own inclination may direct.'").

Citizens also enjoy a liberty interest in their freedom of association.  *See, e.g., NAACP v. Alabama,* 357 U.S. 449, 465-66 (1958) (recognizing the freedom of association as a fundamental value implied in the First Amendment guarantees coming under the protection of the Fourteenth Amendment due process clause).  Finally and fundamentally, citizens enjoy the right of access to courts, the infringement of which is subject to heightened judicial scrutiny.  *Tennessee v. Lane*, 541 U.S. 509, 510 (2004).

Higginbotham's Second Amended Complaint can be read as alleging against Roberts a deprivation of property by impounding and damaging his van, a deprivation of his liberty rights in preventing him from entering the city to access courts and for other innocent purposes, and in prevening him from associating with people of his choosing.

The court will first address Higginbotham's characterization of Officer Roberts's statements to him as a confession of sorts to damaging his van and, thus, taking his property without due process of law.  Officer Roberts was not involved in the September 22, 2010 stop and arrest of Higginbotham, resulting in the impounding of his van.  Higginbotham alleges that significant damage occurred to his van during the time he was in jail and his van was impounded: his radiator cap had been removed, his tag light was missing, his radiator drain valve had been opened causing his van to overheat on the way home, both radiator hoses had been loosened, the engine was damaged requiring rebuilding, the heads were cracked, and  four bolts holding the water pump in place had been loosened and backed out of the engine block one-quarter of an

inch.  Although Higginbotham did not initially know who was responsible for these damages, he alleges that Roberts's subsequent statements to him in April of 2011 represent an acknowledgment of Roberts's responsibility for that damage: " I stopped you from driving your van, and I will stop you from driving this car. . ."

The court disagrees that Roberts's statement is obviously and necessarily a confession of responsibility for the damage to Higginbotham's van.  The statement could just as easily represent Roberts's acknowledgment that he and other officers had given Higginbotham appropriate traffic citations related to his driving the van.  Roberts's statement referring to stopping Higginbotham from driving his van does not, in and of itself, support a plausible claim for violation of due process through damage to his van.

However, taken as a whole, and if true, Higginbotham's allegations about Roberts's various statements to him do state a plausible claim that Roberts had a plan or orchestrated a plan in which a number of Pleasant Grove officials participated (1) to stop Higginbotham from enjoying his rights to personal mobility within the City of Pleasant Grove and freedom of association with people in Pleasant Grove because of Higginbotham's association with supposed drug dealers and junkies; and  (2) to stop Higginbotham's access to the courts to appeal his convictions.   The court notes that Higginbotham has alleged facts supporting his claim that Roberts was behind the harassment and the prevention of his traveling into and around Pleasant Grove; according to those alleged facts, Roberts ordered Higginbotham to stay out of Pleasant Grove and specifically told Higginbotham that he had such a plan.

Other facts indicate that Roberts's statements to Higginbotham were not idle threats but that Roberts carried through with them; the officers stopping Higginbotham on March 28, 2010

61

and May 3, 2011 specifically told him that they were following orders of Roberts (and other Pleasant Grove city officials).   And, even though Higginbotham allegedly communicated to Roberts at the end of April of his need to enter the city for a legitimate purpose – filing an appeal bond, Pleasant Grove officials still prevented him from entering the city on May 3, 2011 without providing him a hearing or any other process at the time.

Further, the allegations of the Second Amended Complaint reflect that Roberts's order preventing Higginbotham's entry into the city occurred *after* Higginbotham discussed with Roberts his intention to enter the city for access to the court to file an appeal, and *after* Roberts specifically told him that he would issue an order preventing that access.

Higginbotham's allegations in the instant case satisfy the first and second elements of a procedural due process claim.  Given the factual allegations, the court must conclude that "there is more than a sheer possibility" that Higginbotham has been deprived of a constitutionally protected liberty interest by state action.  *See Iqbal,* 556 U.S. at 678.

The remaining question is whether the allegations reflect constitutionally inadequate process.  The factual allegations in the instant case show that a process existed regarding police issuance of the tickets to Higginbotham when he entered Pleasant Grove and his challenge to that ticketing.  However, the allegations further show that Roberts and the City of Pleasant Grove interfered with that process with the action taken on May 3, 2011, preventing Roberts from having access to the courts to appeal the judgment that he was guilty of the traffic charges and criminal possession of Paxil.  Further, the facts as alleged show that the city provided no "process" on May 3, 2011 and thereafter for Higginbotham to object to his being turned away from the city limits on that date.  The pleading does state that a tornado had recently ravaged the

62

Pleasant Grove area, but it also states that the May 3 incident occurred during the day and when the courthouse was open for business.  The court FINDS that Higginbotham has sufficiently alleged a deprivation of due process.

As discussed previously, because Roberts raises qualified immunity, the court FINDS that any reasonable officer in Roberts's shoes would know that the alleged conduct – ordering a citizen to stay out of a city based only on his association with others, and then making sure that other officers carried through that order to prevent him from entering a city to go to court and appeal a conviction –  constituted a deprivation of the citizen's liberty interests and violated that citizen's clearly established rights to due process.  Accordingly, the court DENIES the motion to dismiss as to the claim in Count Eight against Roberts.

### (4) Count Ten- Defamation of Character resulting in a violation of constitutional rights

In Count Ten of the Second Amended Complaint, Higginbotham claims that Roberts defamed his character when he allegedly told two United States Marshals that Higginbotham was a heroin dealer and that this defamation resulted in a violation of his constitutional rights.

Although Count Ten does not specify which constitutional rights were abridged, the court assumes that he alleges a due process violation, i.e., that Roberts deprived him of a constitutionally protected interest and that his reputation was such an interest.  However, "allegations of injury to reputation alone do not support a section 1983 claim for violation of due process, and therefore must be accompanied by a constitutionally recognized injury."  *Cypress Ins. Co. v. Clark,* 144 F.3d 1435, 1436 (11th Cir. 1998).   Under this "stigma-plus" standard, a plaintiff must show that the government not only damaged his reputation but also deprived him

of a constitutionally recognized property or liberty interest.

In Count Ten, the Second Amended Complaint specifically refers back to ¶ 63, in which Higginbotham recounts that Roberts issued to him a false citation for driving a vehicle with bald tires, and ordered him not to re-enter the City of Pleasant Grove except to pay the false citation even though Higginbotham communicated his intention to transact legal business and to make an appeal bond to the County at a courthouse within the Pleasant Grove city limits.  The U.S. Marshal ordering Higginbotham to stay out of the city allegedly tied that order to Roberts's defamatory statement, explaining that "**These police officers claim that you are a heroin dealer, and we have no reason to doubt them. . . .**"  (Doc. 13, at 23) (emphasis in original).

A subsequent paragraph of the pleading alleges that when Higginbotham later attempted to re-enter the city to post the appeal bond and to transact legal business at the courthouse, National Guard soldiers refused to let him past a checkpoint, citing orders from Roberts, the U.S. Marshal's office and others.  The evidence eventually may show that the reason why Higginbotham and others were turned away from Pleasant Grove was because of the emergency situation from the tornado, not because of orders from Roberts and others that Higginbotham himself was excluded from the City because of a feud between him and city officials.   If the evidence reflects that the emergency situation was the true reason, that reason would be a solid defense.  However, the court must accept the allegations as true, and these allegations appear to state a claim under the stigma-plus standard.  Further, although Roberts raises his entitlement to qualified immunity, every reasonable officer in his shoes would have known that preventing a citizen from re-entering the city to pursue his legal rights under these alleged circumstances – a feud between the non-violent citizen and city officials – and without legal justification, would be

a well-established violation of the citizen's constitutional rights.   Further, the alleged defamation was tied to that constitutional deprivation.  Consequently, at this stage of the case, and given Higginbotham's *pro se* status,  the court FINDS that the motion to dismiss is due to be DENIED as to this claim against Roberts.

In sum, the court FINDS that the motion to dismiss is due to be GRANTED as to the following claims against Roberts: Count One as to April 29, 2011, April 30, 2011, and May 3, 2011 incidents; Count Two; and Count Five.  The court will DISMISS those claims, and because this pleading is Higginbotham's third, the dismissal will be WITH PREJUDICE.  The claims asserted against Roberts in the following counts will proceed at this stage: Count One as to the March 27, 2010 incident; Count Six; Count Eight; and Count Ten.

### d. Individual Claims against Nathan **BULLARD**

The Second Amended Complaint asserts the following claims against Officer Bullard individually: (1) Count One - § 1983 claim for unlawful search and seizure on March 28, 2010 and October 12, 2010 in violation of the Fourth Amendment; (2) Count Two - § 1983 claim for excessive force; and (3) Count Eight - § 1983 claim for violation of due process rights.  The court has previously addressed and dismissed the tort of outrage claim, which is asserted against Bullard, in Count Five, and the Defendants' motion to dismiss does not encompass the claim for assault asserted in Count Six against Bullard.

*(1) Count One - § 1983 claim for unlawful search and seizure*

Count One alleges that Bullard violated Higginbotham's rights under the Fourth Amendment, guaranteeing citizens' right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The Second

65

Amended Complaint identifies two "unlawful search and seizure" incidents involving Officer

Bullard: March 28, 2010 and October 12, 2010.

        A.  March 28, 2010

      According to the Second Amended Complaint, on about 9:45 p.m. on March 28, 2010,

Higginbotham left Bill Howard's residence in Pleasant Grove, and two Pleasant Grove police

cars began following him even though he had committed no criminal actions or violations of

municipal ordinances during that trip.  Earlier that same day, police cars had followed him on

two separate trips to or from Bill Howard's residence.  Higginbotham makes the following

allegations about the 9:45 p.m. stop:

> Officer Nathan Bullard approached his van on the driver side, and []
> Officer Michael Green approached on the passenger side.  The plaintiff
> alleges that Officer Bullard quickly shoved a spotlight in his face,
> temporarily blinding him.  The plaintiff then asked Officer Bullard why he
> had been pulled over, when he had committed no crime.  The plaintiff
> alleges that Officer Bullard made the statement, "**You just left a known
> drug house!**"!  The plaintiff informed Officer Bullard that **leaving a
> known drug house** was not a crime specifically defined in the **Alabama
> Code.**  The plaintiff alleges that Officer Bullard became argumentative and
> then loudly stated, **"You just left a house in which several people have
> overdosed'!**  The plaintiff informed Officer Bullard that **leaving a house
> in which several people have overdosed,** was also not a crime specifically
> defined in the **Alabama Code.**  The plaintiff alleges that Officer Bullard
> became even more argumentative, became belligerent, grasped his
> handgun, attempted to open the plaintiff's driver door, and demanded that
> the plaintiff exit his van so they could discuss the situation.  The plaintiff
> informed him that his driver door was damaged, and that he had to exit on
> the passenger side.  The plaintiff alleges that, at this moment, Officer
> Michael Green became agitated on the passenger side of the van, drew his
> handgun from its holster, and then loudly shouted, **"You should have told
> us you had a gun"!**  The plaintiff alleges that Officer Bullard then drew his
> handgun from its holster and pointed it directly at the plaintiff.  The
> plaintiff alleges that both Officers forced him to exit his van, at gunpoint.
> After the plaintiff exited his van, he informed Officer Green that he did not
> have a gun.  Officer Green then made the statement, "**I see a 9mm**

**handgun under your seat"!** [The plaintiff stated that the gun to which Green referred was a toy that fires plastic BB's, told the officers it was a toy, which the officers eventually confirmed.] The plaintiff alleges that Officer Bullard repeatedly shoved his spotlight in the plaintiff's face, and then stated, **"You have nystagmus... That means you are drunk, and under the influence of drugs."** The plaintiff informed Officer Bullard that he did not have nystagmus, was not drunk, and was not under the influence of drugs. The plaintiff alleges that Officer Bullard made the statement, **"You just left Bill Howard's House... That makes you a god-damned heroin dealer, or a god-damned junkey. We've been watching and following you all week... We know the times you have arrived at Bill's, and the times you have left!"** The plaintiff informed Officer Bullard that he would not tolerate language of this nature. Officer Bullard then asked to see the plaintiff's arms, in order to look for needle tracks. The plaintiff had no objection to showing his arms, but when no needle tracks could be found, the plaintiff alleges that Officer Bullard became very angry, grabbed the plaintiff, shoved him into the passenger side of his van, and began to conduct an **illegal search** of the plaintiff's person. The plaintiff alleges that Officer Bullard made the threat, **"If I get stuck with a dirty needle, I will blow your god-damned head off right here and now!"** The plaintiff states that nothing was found on his person during this illegal search. The plaintiff states that Officer Bullard then wrote him a citation for having an expired insurance card. The plaintiff informed Officers Bullard, and Green that their actions constituted **violations** of his **Federal Civil Rights.** [The officers advised Higginbotham that several city officials and Sergeant Roberts had ordered them] to stop, identify, and search every vehicle and individual who visits the residence of Bill Howard [, and, when Higginbotham insisted that he was running legitimate errands, Officer Bullard warned him to] stay out of Pleasant Grove, [or] he would be stopped, searched, and ticketed every time he was observed in their jurisdiction.

(Doc. 13, at 6-7).

These allegations show that Bullard stopped Higginbotham after he had made several

trips in one day to a "known drug house" with a history of patrons overdosing. Higginbotham

contends that stopping and later searching him under these circumstances represents a violation

of his Fourth Amendment rights. The first issue is whether the officer had "reasonable,

articulable suspicion based on objective facts" to pull Higginbotham's car over in the first place

simply because he had visited this "known drug house."  *See United States v. Nunez,* 455 F.3d 1223, 1226 (11th Cir. 2006) (concluding that " enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity").  "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000).

In the instant case, based on the allegations of the Second Amended Complaint, Bullard articulated no reason for the investigatory stop of Higginbotham except that Higginbotham had left Howard's home.  The facts, as alleged, indicate that Higginbotham did not violate any traffic laws or ordinances, except his failure to have an up-to-date insurance card, which the officers did not know prior to the stop.  Bullard did not accuse him of committing any traffic violation or behaving suspiciously; when Higginbotham asked why he had been stopped, Bullard's only articulable reason was that he had left a known drug house.  Although Bullard later accused Higginbotham of being drunk or under the influence of drugs, that accusation was based on Higginbotham's eye movements when the officer shone light on them, something the officer did not see until he stopped the car and could not have observed from a distance at night.

The court FINDS that the facts alleged reflect that Bullard had no reasonable articulable suspicion to pull Higginbotham over.  Further, the court FINDS that any reasonable officer in Bullard's position would know that stopping a car simply because the citizen left a known drug house, without more, constitutes a violation of the Fourth Amendment law, clearly established as of March 28, 2010.  *See Wardlow,* 528 U.S. at 124. Therefore, based on the facts alleged,

Officer Bullard is not entitled to qualified immunity.  The motion to dismiss is due to be
DENIED as to this claim.

B.  October 12, 2010

On this occasion, Higginbotham drove away from the home of Chris Gardner about 1:30
p.m. on October 12, 2010 in Gardner's car to pick up a friend, Andrew Howe, from a probate
court meeting in the Bessemer county courthouse.  Officer Bullard stopped him en route and
Bullard made the comment that the officer had assumed he was stopping *Gardner*.  Bullard then
called three more officers as backup, and informed Higginbotham: "**Just for the record,
driving this car is going to get you stopped a lot, okay?**"  Bullard proceeded to question him
about Gardner, Bill Howard's son, and John and Debra Bates.

Higginbotham characterizes this stop as an illegal search and seizure because no reason
existed to stop the car.  *See Delaware v. Prouse,* 440 U.S. 648, 648 (1979) ("Stopping an
automobile and detaining its occupants constitute a 'seizure' within the meaning of the Fourth
and Fourteenth Amendments, even though the purpose of the stop is limited and the resulting
detention quite brief . . .").  However, elsewhere in the pleading, Higginbotham states that
Gardner's license had been revoked, and the city officers were aware which car was Gardner's.
Further, Higginbotham alleges no attendant search of Higginbotham or the vehicle he was
driving.  Therefore, the court FINDS that, based on the facts alleged, reasonable articulable
suspicion existed for the stop –  that is, a suspicion that the driver was operating a car without a
license, because the officer recognized the car as belonging to a person whose driver's license
had been revoked.  Alternatively, the court FINDS that every reasonable officer in Bullard's
position would *not* have known that this conduct violates Higginbotham's Fourth Amendment

69

rights, and Bullard is entitled to qualified immunity.  Therefore, the court FINDS that the

motion to dismiss is due to be GRANTED as to this claim against Bullard; the claim is due to be

DISMISSED.  Because this pleading is Higginbotham's third attempt, the court will dismiss it

WITH PREJUDICE.

### (2)  Count Two - § 1983 claim for excessive force against Bullard

In this Count, Higginbotham claims that Bullard's conduct of shining a light into

Higginbotham's face and forcing him to exit his van at gunpoint constituted excessive force.

Because this alleged use of force occurred in the process of traffic stops that Higginbotham

characterizes as illegal stops and seizures, the court FINDS that this claim "is subsumed in the

illegal stop or arrest claim and is not a discrete excessive force claim."  *See Jackson,* 206 F.3d at

1171.  Alternatively, Higginbotham alleges no resulting damage or medical care, and the court

FINDS that the force alleged was *de minimus* and does not support a claim for excessive force in

violation of the Fourth Amendment.  *See Nolin*, 207 F.3d at 1257 and discussion *supra.*

Thus, the motion to dismiss is due to be GRANTED as to this claim for excessive force against

Roberts; the court will DISMISS it WITH PREJUDICE because this pleading is Higginbotham's

third attempt.

### (3) Count Eight - § 1983 claim against Bullard for violation of due process

Higginbotham alleges that Bullard's conduct of stopping and/or searching him based on

Higginbotham's visiting a known drug house violated his constitutional right to due process.  As

discussed previously, the allegations that the officer was stopping Higginbotham without

probable cause because Higginbotham visited Howard, as part of a plan to harass Higginbotham

on visits and discourage him from exercising his freedom to move in the city's public places and

to freely associate with people of his choice, states a plausible claim of violation of Fourth Amendment rights.

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor,* 490 U.S. 386, 395 (1989)). Therefore, the court FINDS that this claim falls under the Fourth Amendment, and will limit its analysis of this claim to the Fourth Amendment, as already addressed and decided. The court will GRANT the motion as to any substantive due process claims brought under the Fourteenth Amendment, and will DISMISS those claims.

In sum, as to the claims asserted against Bullard, the court finds that motion is due to be GRANTED as to the claims asserted in Count One regarding the October 12, 2011 incident; Count Two; Count Five; and Count Eight. Those claims will be DISMISSED WITH PREJUDICE. The claims asserted in Count One as to the March 28, 2010 incident, and Count Six remain.

### e.  Individual Claims against Officer Stacy **LAWSON**

The Second Amended Complaint asserts the following claims individually against Officer Lawson: (1) Count One - unlawful search and seizure in violation of the Fourth Amendment regarding the stops on October 31, 2010 and November 28, 2010; and  (2) Count Eight - violation of due process.  The court has previously dismissed the claim for tort of outrage asserted against all Defendants in Count Five.

*(1) Count One - unlawful search and seizure against Lawson*

In this Count, Higginbotham points to two incidents involving Officer Lawson that Higginbotham characterizes as unlawful searches and seizures: the stop on October 31, 2010, and the subsequent stop on November 28, 2010.

On October 31, 2010,  Higginbotham claims that when he arrived at the home of Chris Gardner at approximately 5:00 p.m., driving Gardner's car, two police cars pulled up behind him with light bars activated.  Officer Lawson approached Higginbotham in Gardner's driveway, and when he asked why she was following him, she replied, **"The owner of this car is revoked."** (Doc. 13, at 17) (emphasis in original).   Lawson took his driver's license, returned to her police car, and approximately ten minutes later, issued him a citation for failure to use his turn signal, which she claimed her dashcam had recorded.  Higginbotham does not specifically allege that he did indeed use his turn signal.

On November 28, 2010, Higginbotham alleges that he left the home of Chris Gardner at approximately 6:00 p.m. and Lawson stopped him, making the following statements: "Are you driving this car again... I'm going to stop it every time I see it... I can't tell who's driving it... The owner is revoked... You need to get you your own car."

Although Higginbotham asserts that Lawson's conduct on both of these occasions was unconstitutional, the allegations merely show that Lawson was familiar with the car Higginbotham was driving at the time, knew that the driver's license of its owner had been revoked, and was attempting to determine whether the driver was driving with a revoked license, i.e., she had a valid reason to stop the car.  Given those facts, Higginbotham has not stated a plausible claim for any constitutional violation in stopping the car, and the motion to dismiss is

due to be GRANTED as to the claim in Count One asserted against Lawson.  Alternatively, the court finds that the facts as alleged do not show that  every reasonable officer in Lawson's shoes would have known that she did not have reasonable articulable suspicion to stop the car nor do they show that her conduct otherwise obviously violated Higginbotham's constitutional rights. *See Marx,* 905 F.2d at 1505-06; *Montoute,* 114 F.3d at 184.  Thus, alternatively, the court finds that Lawson is entitled to qualified immunity as to the claim in Count One against her.  The motion is due to be GRANTED as to all claims in Count One asserted against Officer Lawson, and the court will DISMISS them.

### *(2) Count Eight - Due Process claim against Lawson*

In paragraph 70 of the Second Amended Complaint, Higginbotham alleges that the conduct of Officers Grigsby and Lawson on September 27, 2011 in arresting Higginbotham pursuant to an arrest warrant violated his due process rights.  The court has already found that the facts alleged against Grigsby regarding this arrest – which are identical to those alleged against Lawson – did not state a plausible claim for a due process violation.  That analysis applies equally to Lawson.

The court FINDS that the facts alleged do not state a plausible claim against Lawson, and alternatively, that to the extent they do, every reasonable officer in Lawson's position would *not* know that her actions on September 27, 2011 violated Higginbotham's due process rights. Therefore, the motion to dismiss is due to be GRANTED as to that claim against Lawson.  The court will DISMISS that claim.

In sum, as to all claims asserted against Lawson, the court FINDS that the motion to dismiss is due to be GRANTED.  As this pleading is Higginbotham's third attempt, the court will

DISMISS those claims WITH PREJUDICE.  No claims remain against Lawson; therefore, the court will DISMISS Lawson as a party Defendant.

### 4.  "Motion to Dismiss" filed by Mayor Brasseale and Director Knight re Individual Capacity Claims (doc. 26)

In this motion, the City's Mayor and Public Safety Director request the dismissal of all claims against them in their individual capacities: Count Three - inadequate training and supervision of Officers Reed and Grigsby; Count Four - "deliberate indifference through custom" and policy of excessive use of force and unconstitutional seizures of community citizens; and Count Five- tort of outrage based on notice that City police officers were drawing their handguns and repeatedly using their authority to intimidate citizens.  The court has already determined that the tort of outrage claim is due to be dismissed, but the court will address the two remaining claims separately.

### a.  Count Three - Inadequate Training and Supervision

As a prefatory statement, as discussed previously, Higginbotham makes claims that certain officers stopped and searched him and the vehicles he was driving without cause, stole from him, used excessive force on him, defamed him, assaulted him, and committed the tort of false arrest and false imprisonment, and maliciously prosecuted him, etc.  Although he claims that Mayor Brasseale and/or Director Knight are guilty of failing to adequately train and supervise the wrongdoers who committed this wrongful conduct, Higginbotham does not claim that the Mayor and Director themselves directly performed any of these alleged wrongful actions.

The law provides that  "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 676 (2009). In other words, for Higginbotham's claims to be successful, he cannot merely allege that Brasseale and Knight are automatically liable merely as trainers and supervisors of the wrongdoers.  Rather,  he "must plead that each Government-official defendant, through his own individual actions, has violated the Constitution."  *Id.* Stating a claim against a government official is not easy: "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  *Mann v. Taser Int'l,* 588 F.3d 1291, 1308 (11th Cir. 2009).

Supervisory liability under § 1983 attaches either when "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of a supervising official and the alleged constitutional violation." *Myers v. Bowman,* 713 F.3d 1319, 1328 (11th Cir. 2013).   "A causal connection can be established by, *inter alia,* 'facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Keating v. City of Miami,* 598 F.3d 753, 762 (11th Cir. 2010) (quoting *Gonzalez v. Reno,* 325 F.3d 1228, 1235 (11th Cir. 2003)).  A supervisor cannot be held liable pursuant to § 1983 for *negligence* in the supervision or training of his employees.  *Greason v. Kemp,* 891 F.2d 829, 836-37 (11th Cir. 1990).

The court notes that another method of stating a claim against a supervisory defendant is to allege the existence of the supervisor's custom or policy that resulted in deliberate indifference to the plaintiff's constitutional rights, as alleged in Count Four and addressed subsequent to this discussion. Accordingly, the court will address whether Higginbotham, in his Second Amended Complaint, has plausibly alleged a causal connection between the actions of Mayor Brasseale and

75

Director Knight.

Count Three of the Second Amended Complaint, entitled "Inadequate Training and Supervision," states that the Mayor and Director

> failed to adequately train, and supervise the Pleasant Grove Police Officers, including Mark Reed, Jonathan Grigsby, in the areas of seizure, arrest procedures, investigatory stops, the use of force, the use of firearms, and the constitutional rights of their citizens.  The Defendants, therefore exhibited reckless disregard for, and deliberate indifference to the Plaintiff. Additionally, the Defendants failed to monitor the activities of the law enforcement officials, and failed to properly supervise their activities, and conduct.  Defendants Mayor Jerry W. Brasseale, and Public Safety Director, Robert J. Knight were made aware of the Defendants' actions, but failed to take any type of corrective action.  Said failure to supervise, resulted in injury to the Plaintiff.

(Doc. 13, at 29, ¶ 95).  It also incorporates by reference the preceding paragraphs of the pleadings.

To expect the court and the other parties to pick through 89 paragraphs and to speculate about what sentences might or might not fall under Higginbotham's claim in Count Three is not appropriate and is not a role that this court should have to play.  However, keeping in mind Higginbotham's *pro se* status, the court has attempted to do so, and notes the following paragraphs:

> *¶ 16 (Stating that on Sunday, March 28, 2010, Officer Bullard and Green informed Higginbotham that Brasseale, among others, had ordered them) "to stop, identify, and search every vehicle and individual who visits the residence of Bill Howard" and they promised he would be "stopped, searched, and ticketed every time he was observed in their jurisdiction."  (Doc. 13, at 6).
> * ¶¶ 7-11 (Stating that officers harassed Higginbotham by following him and stopping him when he was driving to/from Howard's house in Pleasant Grove on March 27, 2010 - no citation); 13-18 (same March 28, 2010 - citation for expired insurance card); 24-35 (stating that officers harassed Higginbotham by following him and stopping when he was visiting Chris Gardner's house and Bill Howard's house in Pleasant Grove, eventually arresting him on September 19,

76

2010 for criminal possession of prescription drugs, carrying a concealed weapon, operating a vehicle without a tag light); 43 -45 (officer harassed him when he was driving Gardner's car on October12, 2010 - no citation); 47-48 (officer harassed him when he was driving Gardner's car on October 31, 2010 and gave him a citation for failure to use turn signal); 49-50 (officer harassed him when he was driving Gardner's car on November 28, 2010 - no citation); 60 (he went to Gardner's house on April 28, 2011 and was told by national guard that no one could enter Pleasant Grove after 9 PM); 61 (officer harassed him when he was visiting Gardner's home on April 29, 2011 - given a ticket for driving on bald tires); 63-64 (officers harassed him when he visited Gardner's home on April 30, 2011); 66 (officers harassed him when he tried to enter Pleasant Grove to conduct legal work at courthouse on May 6, 2011);

*¶ 20 stating that on April 1, 2010, Higginbotham mailed a letter to Brasseale complaining about the harassment he had received from the police department (alleged wrongful stops and searches of his vehicle and attendant alleged improper use of force against him when he visited Bill Howard violating his constitutional rights) through March 28, 2010, and received no response from Brasseale which "constitutes **prima facie** evidence that Mayor Brasseale did in fact order the Pleasant Grove Police Dept. to stop, identify, and search every vehicle, and individual who visits the residence of Bill Howard." [3]

*¶ 42 stating that on October 4, 2010, Higginbotham mailed another letter of complaint to Brasseale outlining further harassment involving Officers Reed and Grigsby that allegedly occurred on September 19, 2010 and violated his constitutional rights, and demanding a police investigation

*¶ 51 stating that on January 3, 2011, Higginbotham mailed a letter to the City of Pleasant Grove reiterating complaints he had made in his April 1 letter to the Mayor and demanding a police investigation.  The City never responded to his letter.

* ¶ 63 stating that Sergeant Roberts allegedly issued a false citation for driving on bald tires and after he and U.S. Marshals ordered Higginbotham to stay out of Pleasant Grove, including to do legal work at the courthouse on Tuesday, May 3, 2011, Roberts said: "You will NOT come into Pleasant Grove on Tuesday... I will see to that... I stopped you from driving your van, and I will stop you from driving this car.... I will issue a written order to every checkpoint that you are NOT allowed to enter Pleasant Grove, and I will have it signed by the Mayor!"!

*¶ 65 stating that when Higginbotham attempted to enter the City of Pleasant Grove on May 3, 2011 to perform legal business at the county courthouse, including making an appeal bond, solders informed him that they had instructions from others, including "the Mayor's Office that he was not allowed to enter Pleasant Grove for any reason.  The plaintiff alleges that he was forced to turn around and leave the City Limits of Pleasant Grove." [Higginbotham proceeds to

allege that although this incident occurred shortly after a tornado caused damage to areas of Pleasant Grove, the City Hall and county courthouse were not damaged and were open for business on May 3, 2011.]

      \* ¶ 66 stating that Higginbotham mailed a letter of complaint against Sergeant Roberts and others to the City of Pleasant Grove on May 6, 2011 and sent a second copy on June 6, 2011, with a third letter sent on Jun 29, 2011, outlining his charges of constitutional violations occurring in April of 2011 and explaining that Sergeant Roberts and others had prevented him from making an appeal bond. The City never responded to these letters.

(Doc. 13).

### (1). *Supervisory Liability*

Supervisory liability under § 1983 attaches either when "the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of a supervising official and the alleged constitutional violation." *Myers v. Bowman,* 713 F.3d 1319, 1328 (11th Cir. 2013).   Higginbotham has not alleged that Brasseale and Knight were present at the time the wrongful acts occurred.  But, he has alleged facts that he claims would establish a causal connection.  Accordingly, the court will address whether Higginbotham, in his Second Amended Complaint, has plausibly alleged a causal connection between the actions of Mayor Brasseale and Director Knight.

### A.  Supervisory Liability for *Directing* Acts

One means of alleging a causal connection is to state a plausible claim that a defendant directed the unlawful acts of others.  In the instant case, Higginbotham has alleged in Count Three that Mayor Brasseale and Director Knight failed to adequately train and supervise the alleged active wrongdoers.  Except to the extent that it incorporates by reference preceding paragraphs, the text of Count Three does not specifically state that Brasseale or Knight *directed* the wrongdoers from acting as they did, but simply uses conclusory language that their liability

78

hinges upon alleged sins of omission: the failure to train, the failure to supervise, the failure to monitor, the failure to take corrective action.

Having examined the paragraphs of facts that Count Three incorporated by reference, the court FINDS that Higginbotham has alleged no facts stating that *Knight directed* the wrongful activity.  Higginbotham has alleged that, on two different occasions, officers allegedly violating his constitutional rights had expressly advised him that they were doing so at the direction of Mayor  Brasseale or the Mayor's office.  However, he has alleged no facts stating that *Knight* was the person in the Mayor's office providing that direction.   Accordingly, the court FINDS that Higginbotham has not alleged a causal connection based on Knight's direction of the wrongful activity, and thus, has not stated a plausible claim against Knight on that theory.

As noted above, Higginbotham specifically alleged that Brasseale directed wrongful activity and has also alleged that he wrote Brasseale and complained about the violation of his constitutional rights and that Brasseale failed to respond.  While the court disagrees with Higginbotham that Brasseale's failure to respond is *prima facie* evidence that he directed such activities, the allegations about the letters do include facts which, if proven, would indicate that the Mayor was notified of the incidents.  Those facts, added to the officers' words about the Mayor's involvement, could represent believable evidence that the Mayor was indeed directing the harassment of Higginbotham and that the harassment violated Higginbotham's constitutional rights as previously discussed.

In any event, the court FINDS that Higginbotham has alleged a causal connection between the alleged constitutional violations and the Mayor's own conduct based on factual allegations supporting an inference that the Mayor *directed* the unlawful action.

79

B.  Supervisory Liability for Knowledge plus Failure to Stop

In Count Three, Higginbotham also attempts to establish a causal connection by alleging that Brasseale and Knight "were made aware of the Defendants' actions, but failed to take any type of corrective action."  (Doc. 13, at 29).  The Defendants can be "made aware" of the constitutional violations by being told or by widespread abuse that is so "obvious, flagrant, rampant and of continued duration" that the Defendants are considered to receive notification as a matter of law.  *See Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990).

Higginbotham has alleged no such widespread abuse.  Indeed, although he has alleged that the Mayor and other city officials directed officers to stop, identify, and search anyone visiting the home of Bill Howard, he has not alleged that the officers actually harassed any citizens except himself and the people riding with him, that this harassment was so widespread that it was public knowledge or known at City Hall (except known by those directing it), or that the harassment had been the subject of media attention or of other citizen complaints.

Higginbotham has alleged that he sent letters to the Mayor or his office beginning on April 1, 2011, but the Second Amended Complaint presents no similar factual allegations notifying *Knight* of a need to take corrective action.  The generic allegation in Count Three that Knight was aware of the constitutional violations and did nothing is a mere conclusion,  devoid of any specific facts to support that conclusion, and devoid of any facts supporting Knight's notification of a need to supervise or train, the notification that failing to act on the need would violate citizens' constitutional rights, and his deliberate indifference to that need.  Further, the alleged fact that Higginbotham sent a letter to the Mayor's office does not mean that *Knight* saw or heard about that letter, and the Second Amended Complaint does not specifically allege that

80

Higginbotham's letter of complaint directed to the *city* represents notice to *Knight.*

Accordingly, the court FINDS that the claim in Count Three against Knight does not allege a causal connection between the alleged constitutional violation and Knight's own actions or inaction, and thus, does not state a plausible claim against him;  the motion to dismiss is due to be GRANTED as to the Count Three claims against Knight.  Alternatively, the court FINDS that Knight was acting within the scope of his discretionary aruthority at the time of the alleged wrongful conduct, and a reasonable person in Knight's position would not have known that omitting training or supervision in this area would cause city officials to violate citizens' constitutional rights, and Knight would be entitled to qualified immunity as to this claim.  As this pleading is Higginbotham's third attempt, the court will DISMISS the claims alleged in Count Three against Knight WITH PREJUDICE.

The Second Amended Complaint does present facts that Mayor Brasseale received notice of the constitutional violations directed at Higginbotham, and yet, that he did nothing.  If the Mayor directed the acts, he received notice in early April of 2011 that the officers had acted on his directions and that Higginbotham's constitutional rights were violated.  Similarly, if the Mayor did not direct the acts, he nevertheless received notice in early April of 2011 via Plaintiff's letter that the officers were violating Higginbotham's constitutional rights and were claiming to do so based on the Mayor's orders.  The court FINDS that the alleged facts show notice to the Mayor.

To successfully allege a failure to correct claim under a theory of supervisory liability, the supervisor must "have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation."

81

*Keating,* 598 F.3d at 765.  The court notes that common sense dictates if the Mayor ordered that the officers commit the constitutional violations and they did so, then naturally he would have the ability to prevent or discontinue the constitutional violation that he originally ordered.  *Id.* (finding that because the supervisors "had the authority, and exercised the authority, to direct the subordinate officers to engage in unlawful acts..., they likewise had the authority to stop the ... unlawful acts").  Thus, Higginbotham has alleged facts establishing a causal connection between the Mayor's alleged failure to stop the subordinate officers from acting and the alleged constitutional violations.

Finally, as Mayor Brasseale raises qualified immunity, the court FINDS that the alleged failure to correct violated clearly established law.  The practice of stopping and searching all people who visit a residence, regardless of whether probable cause exists that they have committed a crime, violated clearly established law.  *See Wardlow,* 528 U.S. at 124.  And, preventing a citizen from entering freely in public areas and to  transact legal business at the courthouse without justification violated clearly established law.   *See Catron,* 658 F.3d at 1266 (stating that citizens have a constitutionally protected liberty interest in traveling on city lands open to the public); *Morales,* 527 U.S. at 54 (recognizing that an individual has a constitutionally protected right to remain in a public place of his choice); and *Tennessee v. Lane,* 541 U.S. at 510 (recognizing that citizens enjoy the fundamental right of access to courts).

In sum, the court FINDS that the claim in Count Three against Mayor Brasseale alleges a causal connection between the alleged constitutional violations of others and Mayor Brasseale's own conduct, and thus, states a plausible claim; it alleges facts that, if proven, would establish or help to establish that Mayor Brasseale directed the city official to violate Higginbotham's

constitutional rights, and/or, that Mayor Brasseale received notification of city officials violating Higginbotham's constitutional rights, but that Brasseale failed to act to prevent further violations, and was deliberately indifferent to the need to act to prevent the violation of Higginbotham's constitutional rights.  Further, because those rights were clearly established in April of 2011 and thereafter, Brasseale is not entitled to qualified immunity.  Accordingly, the motion to dismiss is due to be DENIED as to the claims in Count Three against Mayor Brasseale based on a "failure to correct" theory.

The court notes that Defendants' argument that a "knowledge and failure to stop" cause of action is insufficient to state a cause of action after *Iqbal* is misplaced and ignores the discrimination context of *Iqbal*.  Because the instant case does not allege discrimination based on race, religion, sex, or national origin, the requirement of "purposeful discrimination" for supervisory liability that applied in *Iqbal* does not apply here.

### (2).  Failure to Train Liability

To properly assert a plausible § 1983 claim under a failure to train theory of liability involving police officers, a complaint must allege facts that, if true, would establish that the "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . ."  *Am. Fed'n of Labor & Congress of Indus. Org. v. City of Miami, Fla.,* 637 F.3d 1178, 1188-89 (11th Cir. 2011).   To support a claim of deliberate indifference, the plaintiff must allege facts creating an inference that the supervisor was aware of the need to train officers in the areas of investigatory stop/search/seizure and excessive force, and that the supervisor made a deliberate choice not to do so.

For the reasons discussed previously, the court FINDS as follows:

(1) that the facts alleged do not establish Knight's awareness of the need to train, and that Count Three does not state a plausible claim against Knight.  The motion to dismiss is due to be GRANTED as to this claim against Knight.

(2) that the facts alleged in Count Three do not state the extent, if any, to which the training of Pleasant Grove police officers was actually overseen by Mayor Brasseale or the extent to which he was responsible for the training of police officers.  The motion to dismiss is due to be GRANTED as to the failure to train claim asserted against Mayor Brasseale.

In sum, the motion is due to be GRANTED as to all claims asserted against Knight in Count Three.  As to the claims asserted in Count Three against Mayor Brasseale, the motion is due to be GRANTED IN PART and DENIED IN PART; the motion is due to be GRANTED as to the failure to train claim but is due to be DENIED as to claims against the Mayor based on supervisory liability for allegedly directing wrongful acts and for allegedly failing to stop wrongful acts despite notice of them.

### b.  Count Four - Deliberate Indifference through Custom and Policy

In the first paragraph under Count Four, Higginbotham  incorporates by reference the previous 95 paragraphs of his Amended Complaint, which, given the number of paragraphs is totally unhelpful to the Defendants and the court. In the second paragraph, Higginbotham alleges generically that Brasseale, Knight and others "have tolerated the continued, and repeated excessive use of force, and seizures of the citizens of its community, such that the conduct is so persistent, and widespread as to constitute custom, and policy of the City and the Police Dept." (Doc. 13, at 30).  The paragraph proceeds to allege that Brasseale and Knight received actual notice of officers' excessive use of force on Higginbotham, but that they nevertheless failed to

act and that the inaction represents deliberate indifference.  He presumably brings these claims pursuant to § 1983.

These recitations *in the text of Count Four* are devoid of specific facts such as the particulars about the policy, how long it was in force, prior incidents, specific notification to Brasseale and Knight, etc.  Thus, the text of Count Four alone does not state a plausible claim.  However, as the court listed earlier, other paragraphs incorporated by reference do provide some specific facts.  The best that can be said from these facts is that some city officials – including Brasseale but not specifically identifying Knight – allegedly established a policy directing the officers and other peace officers to stop, identify, and search all individual who visited the residence of Bill Howard in Pleasant Grove, and pursuant to that policy, the police officers of Pleasant Grove stopped, identified, and ticketed Higginbotham every time they caught him visiting Howard.  Further, some city officials – including Brasseale but not specifically identifying Knight – allegedly ordered police officers and other peace officials to stop Higginbotham from entering Pleasant Grove for a period time, and pursuant to that policy, Higginbotham was turned away from the city when he tried to enter it to go to the courthouse on May 3, 2011 even though the courthouse was open for business on that date.

The generic allegations of Count Four include a claim against Knight; however the allegation is a mere conclusion.  Higginbotham states no facts tying the custom and policy to Knight and no facts supporting an inference that he established the custom or policy, or knew about it, or that the custom and policy was so widespread that he would have had to know about it, and was deliberately indifferent to the resulting constitutional violations resulting from it.

Accordingly, the court FINDS that the claim in Count Four against Knight does not allege

a causal connection between the alleged constitutional violation and Knight's own action, and thus, does not state a plausible claim against him; the motion to dismiss is due to be GRANTED as to Count Four claims against Knight. Alternatively, the court FINDS that a reasonable person in Knight's position would not have known that the policy or custom existed and that failing to act to stop that custom or policy from execution would cause city official to violate citizens' constitutional rights; Knight is entitled to qualified immunity as to this claim. As this pleading is Higginbotham's third attempt, the court will DISMISS the claims alleged in Count Four against Knight WITH PREJUDICE. As the court has found that all the claims asserted against Knight are due to be dismissed, the court will DISMISS Knight as a party Defendant.

The claim against Mayor Brasseale is, once again, more troubling. As listed above in the discussion regarding Count Three, Higginbotham states specific facts supporting his claims against Mayor Brasseale, facts supporting the claims that the Mayor either established or helped to establish the policy of (1) stopping and searching every individual who visited Bill Howard in Pleasant Grove, regardless of whether probable cause existed to do so; and (2) refusing to allow Higginbotham to enter the City of Pleasant Grove when he had a right to travel through public spaces, to associate freely with people of his choice, and to transact legal business at the courthouse when the courthouse was open for business. As discussed previously, the law was well-established as of March of 2010 that such policies violate constitutional rights. Accordingly, the Mayor is not entitled to qualified immunity as to this claim, and the court FINDS that the motion to dismiss is due to be DENIED as to this claim in Count Four asserted against the Mayor.

In sum, the motion to dismiss individual claims asserted against Knight and Brasseale is

due to be GRANTED in part and DENIED in part.  More specifically, the motion is due to be GRANTED in its entirety as to the claims against Knight, and those claims will be DISMISSED WITH PREJUDICE, as this pleading is Higginbotham's third effort.  Knight will be DISMISSED as a party Defendant.  As to the claims against Brasseale, the motion is due to be GRANTED as to the failure to train claim in Count Three and the tort of outrage claim in Count Five, and those claims will be DISMISSED WITH PREJUDICE; however, the motion is due to be DENIED as to the claim based on supervisory liability in Count Three, as well as the claims in Count Four.

### D.  Motion to Dismiss by the City of Pleasant Grove (doc. 28)

In the Second Amended Complaint, Higginbotham asserts the following claim against the City: (1) Count Three - inadequate training and supervision of city police officers in the areas of investigatory stops and search and seizure and in the use of force and fire arms; (2) Count Four - deliberate indifference through custom in tolerating police officer conduct involving search and seizures and use of force that violates constitutional rights of citizens; (3) Count Five - tort of outrage which the court previously found is due to be dismissed; (4) Count Seven - false arrest and false imprisonment based on the events of September 27, 2011; (5) Count Eight - violation of due process rights based on Higginbotham's being deprived of his liberty and property without due process of law; (6) Count Nine - malicious abuse of process and malicious prosecution; (7) Count Eleven - double jeopardy.  The court will proceed to address each claim except the tort of outrage claims in Count Five, which the court has already determined should be dismissed.

#### 1.  Count Three - inadequate training and supervision

Plaintiff asserts Count Three's claim of inadequate training and supervision against the

City of Pleasant Grove itself.  "A municipality may only be held liable under § 1983 when one of its policies causes a constitutional injury."  *Am. Fed. of Labor & Congress,* 637 F.3d at 1187 (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1978)).  A policy- or custom-based failure to train may form the basis of a § 1983 claim against a city "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."   *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

To allege the requisite "deliberate indifference," a plaintiff must allege facts that would support an inference that the city was aware of the need to train or supervise, that the natural consequences of the failure to train or supervise would be constitutional violations, and that the city made a "deliberate choice" not to train and supervise its employees.  Allegations that would support notice would be alleged facts showing a "widespread pattern of prior abuse" or constitutional violations of which the city had notice that occurred prior to the constitutional violations made the basis of the suit.  *Am. Fed. of Labor & Congress,* 637 F.3d at 1188 (quoting *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998)).

In the instant case, the Second Amended Complaint does not allege any facts of a "widespread pattern of *prior* abuse."  Rather, the only facts about constitutional violations are those made the basis of this lawsuit committed against Higginbotham.  The first date on which Higginbotham claims to have notified the city or the Mayor or anyone connected with the city about the alleged constitutional violations was on April 1, 2010, and, accordingly, any claim based on the failure to train and supervise must concern only actions that occurred *after* that date. Higginbotham does allege that he notified the Mayor in that letter and in subsequent letters about the wrongful conduct of the officers, including their promise to stop, search, and ticket him every

time he was observed in Pleasant Grove based on orders supposedly emanating from the Mayor and the Pleasant Grove City Council, among others.  Further, he alleges that the Pleasant Grove police officers continued to act on the unconstitutional policy of stopping and searching him any time he came into Pleasant Grove, and that he continued to notify the Mayor and city about those violations but that the city ignored his letters. The May 3, 2011 incident when Higginbotham attempted to enter the city to appeal convictions and was not allowed to enter is one example of incidents that allegedly occurred *after* Higginbotham began notifying the city of the wrongful conduct of its officers and officials.

At a later stage of this case, the evidence will establish whether such a custom or policy existed, or whether a genuine dispute exists on that issue.  If that custom or policy did not exist but certain officers nevertheless were stopping and searching Higginbotham and other citizens visiting Howard and allegedly violating their constitutional rights, then the city received notice of that practice sometime after April 1, 2010 and continued to receive notice of further violations thereafter.  Thus, as Higginbotham alleges, the city arguably received notice of a need to train and supervise those officers who were allegedly committing constitutional violations, and yet, it failed to act, and those alleged violations continued.

In any event, the court FINDS Higginbotham's Second Amended Complaint states a plausible claim against the City on this failure to train or supervise theory – that is, the failure to train and supervise regarding stop and search violations of the Fourth Amendment and other potential due process violations of the Fourteenth Amendment – and thus, the motion to dismiss is due to be DENIED.  The court notes that Count Three also refers to constitutional violations based excessive force; however, because, as discussed previously, the court finds that

89

Higginbotham has alleged no plausible claim for excessive force, the court GRANTS the motion as to the allegations in Count Three regarding the failure to train and supervise as to excessive force.

### 2. Count Four - unconstitutional municipal custom or policy

The Second Amended Complaint also asserts in Count Four that the City of Pleasant Grove had city customs and policies violating constitutional rights.  One of the challenged policies involves the use of excessive force.  Because, as previously discussed, the court finds that Higginbotham has alleged no plausible claim for excessive force, the court GRANTS the motion as to the allegations in Count Four regarding an unconstitutional policy or custom as to the use of excessive force.

A second challenged policy or custom is the policy of stopping and searching anyone who visited Bill Howard regardless of whether officers had probable cause to do so; the policy of stopping and searching and ticketing Higginbotham any time he entered Pleasant Grove to harass him for his connection with alleged drug dealers and junkies, and the subsequent policy of preventing Higginbotham from entering Pleasant Grove city limits at all, even to transact legitimate business and to safeguard his legal rights and related policy to stop him from appealing his conviction.

Section 1983 does provide a vehicle for municipal liability when one of its policies causes constitutional injury.  *See Monell,* 436 U.S. at 694.  In assessing municipal liability, a court must first inquire whether a direct causal link exists between a municipal policy and the alleged constitutional injury.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  For a causal link to exist, the city's policy may not be tangentially related to a constitutional deprivation but

must be "the moving force" behind the constitutional injury. *Cuesta v. Sch. Bd. of Miami-Dade Co.,* 285 F.3d 962, 967 (11th Cir. 2002) (quoting *Gilmere v. City of Atlanta,* 737 F.2d 894, 901 (11th Cir. 1984)). "When a municipal policy itself violates federal law, or directs a municipality to do so, resolving 'issues of fault and causation is straightforward.'" *Am. Fed. of Labor & Congress*, 637 F.3d at 1187 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 US. 397, 404 (1997)). "[T]he conclusion that the action taken or directed by the municipality *or its authorized decisionmaker* itself violates federal law will ... determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Brown*, 520 U.S. at 405 (emphasis added).

The Supreme Court has explained that a plaintiff need not allege a widespread policy or custom on the part of a city for municipal liability to attach; rather, "a final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." *Brown,* 520 U.S. at 406 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 485 (1986) (determining that decision of county prosecutor, acting as city's final decisionmaker, to direct county deputies to forcibly enter petitioner's place of business was a municipal policy giving rise to municipal liability under § 1983)).

In the instant case, Higginbotham has indeed alleged facts stating that a policy or policies supposedly existed upon the orders of top city officials, including the Mayor and the City Council, that the policy violated Higginbotham's constitutional rights, and that the policy caused him constitutional injury when police officers repeatedly enforced it against him. In the Second Amended Complaint, Higginbotham alleges that in 2010 and early 2011 he was routinely stopped

in the city limits without probable cause in violation of the Fourth Amendment, that officers specifically told him that they had such a policy/policies and that the orders to act as they did came from the Mayor, City Council, and Municipal Judge. Further, he has alleged facts stating that in May 2011 he attempted to enter the City of Pleasant Grove to go to the courthouse and appeal a conviction but was turned away by U.S. Marshals and told by those Marshals that they did so on orders from the Pleasant Grove Police Department, Sergeant Roberts, and the Mayor's office that Higginbotham could not enter the city for any reason.

As previously discussed under the section addressing claims against Officer Roberts, the alleged orders from the Mayor and other city officials  – orders to stop citizens who are driving in the city limits or to stop them from entering the city at all and exercising their legal rights solely because of their association with another person with no accompanying probable cause or controlling justification or appropriate accompanying process to object – are orders violating their constitutional rights. *See, e.g., Catron,* 658 F.3d at 1266 (stating that citizens have a constitutionally protected liberty interest in traveling on city lands open to the public and have a constitutional right not to be deprived of that right without appropriate procedural due process); *Lane,* 541 U.S. at 510 (recognizing that citizens enjoy the fundamental right of free access to courts);  *NAACP v. Alabama,* 357 U.S. at 465-66  (recognizing the right to freedom of association as a fundamental value implied in the First Amendment guarantees and falling coming under the protection of the Fourteenth Amendment due process clause); *Morales,* 527 U.S. at 54 (recognizing that an individual has a constitutionally protected right to remain in a public place of his choice).  Accordingly, Higginbotham has stated a plausible claim against the City of Pleasant Grove in Count Four for unconstitutional customs and policies, and the motion

to dismiss is due to be DENIED as to that claim.

### 3.  Count Eight - Due Process

Count Eight does not specify which Defendants violated his due process claims.  The court has already found that the Second Amended Complaint plausibly alleges a claim under Count Four that the City of Pleasant Grove had a policy and/or custom that violated Higginbotham's constitutional rights, including his due process rights under the Fourteenth Amendment; those claims will proceed under Count Four.  To the extent, if any, that Count Eight attempts to present these allegations once again against the city, the court FINDS that they are redundant and are due to be DISMISSED.  Accordingly, the court will GRANT the city's motion to dismiss as to the claims in Count Eight.

### 4.  Count Nine - Malicious prosecution and abuse of process

As discussed previously, Count Nine of the Second Amended Complaint does not specify whether Higginbotham brings this Count under Alabama law or as a § 1983 claim.  The court will address this claim as one brought under federal law because he does not point to any Alabama law.  The court notes, in any event, the common law prong of both the Alabama and federal claim for malicious prosecution contain the same elements. *See Wood v. Kesler,* 323 F.3d at 882.  The court has previously discussed the elements for malicious prosecution, including the requirement that the charge be resolved in favor of the plaintiff.  The two incidents that Higginbotham appears to challenge are (1) the prosecution of charges resulting from the September 19, 2010 incident; and (2) the City's January 24, 2012 act of placing Higginbotham on probation without giving him an opportunity to appeal his convictions.

As to the prosecution of charges from the September 19, 2010 incident, the court has

already noted that those charges were *not* resolved in Higginbotham's favor except for the charge for carrying a concealed weapon. The charges on which he was ultimately convicted cannot form the basis of a malicious prosecution suit. *See id.* While the concealed weapons charge for carrying a toy gun was resolved in Higginbotham's favor, Higginbotham has not specifically alleged a city policy or practice underlying the prosecution of that particular charge, and certainly has not alleged a city policy or practice that was the "moving force" behind that prosecution. *Cuesta,* 285 F.3d at 967.

As to the City's placing Higginbotham on probation for the charges for which he was convicted, again, that City action involved charges for which Higginbotham was convicted and cannot form the basis of a malicious prosecution claim.

As to the abuse of process claims, the court has previously determined that no such cognizable constitutional claim exists pursuant to § 1983. To the extent, if any, that Higginbotham attempts to present claim for abuse of process under Alabama law, that claim requires a showing of malice, and Alabama law provides that a municipality is immune from tort liability for unintentional acts of its agents that are carried out in bad faith or with malice. *See* Ala. Code § 11-47-190 (providing that a municipality is immune from tort liability "unless such injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefore and while acting in the line of his or her duty"); *Ex parte City of Tuskegee,* 932 So. 2d 895, 910 (Ala. 2005); *see also Walker v. City of Huntsville,* 62 So. 3d 474, 501-02 (Ala. 2010) (recognizing that a municipality cannot be held liable for malicious prosecution in light of § 11-47-190).

Therefore, the court FINDS that the motion to dismiss is due to be GRANTED claims in

94

Count Nine against the City  for malicious prosecution and malicious abuse of process; the court

will DISMISS those claims WITH PREJUDICE, as the current pleading is Higginbotham's third.

### 5.  Counts Seven and Eleven

In Count Seven, Higginbotham asserts claims against the City of Pleasant Grove for false

arrest and false imprisonment, and in Count Eleven, it asserts claims for subjecting him to double

jeopardy in violation of his Fifth Amendment rights.  As discussed previously, the City of

Pleasant Grove cannot be held liable for the unconstitutional acts of its police officers and city

officials except to the extent municipal policies or customs caused constitutional violations.  The

court has previously addressed Higginbotham's claims as to the municipal policies that allegedly

caused the violation of his constitutional rights.  The claims in Counts Seven and Eleven

attempting to hold the City of Pleasant Grove liable for the actions of its officers and officials

absent an official policy or custom do not state a plausible claim. Accordingly, court FINDS that

the motion to dismiss is due to be GRANTED as to the claims in those Counts against the City of

Pleasant Grove.  As this pleading is Higginbotham's third, the dismissal shall be WITH

PREJUDICE.

### V.  CONCLUSION

In sum, the court FINDS as follows:

A.    The "Motion to Dismiss Filed by the Pleasant Grove Police Department" (doc. 24) is due

to be GRANTED; the court will DISMISS those claims WITH PREJUDICE, and

DISMISS the police department as a party Defendant.

B.    The "Motion to Dismiss Official Capacity Claims" (doc. 25) is due to be GRANTED; the

court will DISMISS WITH PREJUDICE all official capacity claims asserted against

Mayor Brasseale, Director Knight, Sergeant Roberts, and Officers Roberts, Bullard, Reed, Grigsby, and Lawson.

C.      The "Motion to Dismiss" filed by Officer Grigsby (doc. 30), is due to be GRANTED; the court will DISMISS the individual claims against him WITH PREJUDICE, and, as no further claims remain, the court will DISMISS Officer Grigsby as a party Defendant.

D.       As to the Motion to Dismiss filed by the other officers (doc. 31) based on claims against them in their individual capacities,  the court FINDS that the motion is due to be GRANTED in part and DENIED in part.  More specifically:

(A) regarding the claims against Officer **Reed,** the motion is due to be GRANTED as to the claims set forth in Counts Two, Five, Seven - regarding all claims *except* the arrest for a concealed weapon, and Nine - regarding all claims *except* malicious prosecution for the concealed weapons charge, and those claims will be DISMISSED WITH PREJUDICE; however, the motion is due to be DENIED as to claims set forth in Counts One,  Seven - regarding the false arrest claim based on the concealed weapons charge, Eight, and Nine - regarding the malicious prosecution claim on the concealed weapons charge, and those claims will proceed at this stage. The claim for Assault set out in Count Six will also proceed, because the motion for partial dismissal did not address that claim.

(B) regarding the claims against Officer **Roberts**, the motion is due to be GRANTED as to claims set forth in Counts One (as to the incidents on April 29, 2011 and April 30-May 3, 2011); Two; and Five.  Those claims will be dismissed WITH PREJUDICE.  However, the motion is due to be DENIED as to claims against Roberts set forth in Counts One (as to the incident on March 27, 2010); Eight; and Ten.  Those claims will proceed, along with the claim for Assault set out in Count Six, which the motion for partial dismissal did not address.

(C) regarding the claims against Officer **Bullard**, the motion is due to be GRANTED as to claims set forth in Counts One (as to the October 12, 2011 incident); Two; Five; and Eight. Those claims will be dismissed WITH PREJUDICE. However, the motion is due to be DENIED as to claim against Bullard set forth in Counts One (as to the March 28, 2010 incident).  That claims will proceed, along with the claim for Assault set out in Count Six, which the motion for partial dismissal did not address.

(D) regarding the claims against Officer **Lawson**, the motion is due to be GRANTED; those claims will be DISMISSED WITH PREJUDICE, and the Lawson will be

DISMISSED as a party Defendant.

E.      The motion to dismiss filed by Mayor Brasseale and Director Knight regarding individual

capacity claims (doc. 26) is due to be GRANTED IN PART and DENIED IN PART.

More specifically:

(A) regarding the claims asserted against Director **Knight**, the motion is due to
GRANTED; all those claims will be DISMISSED WITH PREJUDICE, and Knight will
be DISMISSED as a party Defendant.

(B) regarding the claim asserted against Mayor **Brasseale**, the motion is due to be
GRANTED as to Count Five and the failure to train claims in Count Three; however, the
motion is due to be DENIED as to the claim for supervisory liability set forth in Count
Three, as well as the claim in Count Four.

F.      The motion to dismiss filed by the City of Pleasant Grove (doc. 28) is due to be

GRANTED IN PART and DENIED IN PART.  The court will GRANT the motion as to

the claims in Counts Three and Four regarding excessive force, and also the claims in

Five, Seven, Eight, Nine, and Eleven.  The court and will DISMISS those claims WITH

PREJUDICE.  However, the motion is due to be DENIED as to the claims against the city

in Counts Three and Four regarding stopping and searching Higginbotham and other

visitors of Bill Howard without probable cause and preventing Higginbotham from

entering the Pleasant Grove city limits.


The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 30th day of September, 2013.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE